65 F.3d 1351
 Comm. Fut. L. Rep. P. 26,488
Mark CUNNINGHAM, Plaintiff-Appellant, Cross-Appellee,
and
John M. Stewart, et al., Intervening Plaintiffs-Appellants,
Cross-Appellees,
v.
WATERS TAN & COMPANY, et al., Defendants-Appellees,
and
1211 Corporation, formerly known as G.H. Miller & Company,
Intervening Defendant-Cross-Appellant.
John M. STEWART, et al., Plaintiffs-Appellants, Cross-Appellees,
and
Mark Cunningham, et al., Intervening Plaintiffs-Appellants,
Cross-Appellees,
v.
GNP COMMODITIES, INCORPORATED, et al., Defendants-Appellees,
and
1211 Corporation, formerly known as G.H. Miller & Company,
Intervening Defendant-Appellee, Cross-Appellant.
 Nos. 94-2019, 94-2146.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 10, 1995.
Decided Sept. 11, 1995.
 
 Constantine J. Gekas (argued), Adrianne S. Harvitt, Alenna K. Bolin, Harvitt & Gekas, Chicago, IL, for Mark Cunningham.
 Dennis K. Tan, Tempe, AZ, pro se.
 Tom Galbraith, Lewis & Roca, Phoenix, AZ, for GNP Commodities, Incorporated.
 Constantine J. Gekas, Adrianne S. Harvitt, Alenna K. Bolin, Harvitt & Gekas, Chicago, IL, for John M. Stewart, Ardelle Stewart, Ecological Society of America, Incorporated, Eva Patten, Emmerson L. Kumm, Elizabeth M. Kumm, Arkansas Industrial Management, Incorporated, Marie Athens, Angelo Barbetta, Paul Barbetta, Ninetta Barbetta, Amy Bork, Betty Combs, Joseph Ernst, Michael R. Hartman, Heil Family Trust, Dwayne A. Heil, Mary M. Ingoglia, Charles H. Ingoglia, Powell Johnson, John M. Laing, Janet B. Laing, Carolyn Lesio, Catherine Lesio and Elenor Lesio.
 Michele Odorizzi, Howard J. Roin (argued) Andrew S. Marovitz, Mayer, Brown & Platt, Chicago, IL, for 1211 Corporation.
 Constantine J. Gekas, Adrianne S. Harvitt, Harvitt & Gekas, Chicago, IL, for Powell Johnson, David L. Van De Water, Valentina Ang, Arkansas Industrial Management, Incorporated, Marie Athens, Carmelina Azzaro, Salvatore Azzaro, Angelina Azzaro, Joanne Barbetta, Paul Barbetta, Angelo Barbetta, Sr., Algird Bertman, Nicole Bishop, Chester E. Bleikamp, Jr., Jacklyn Boettner, Bernardo Bono and Amy Bork.
 Before ESCHBACH, COFFEY and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Investors defrauded in a commodity pool scheme sued futures commission merchant G.H. Miller & Co. for recovery of their lost funds. Ruling in two consolidated actions, which we shall refer to as the "Cunningham action" and the "Stewart action," the district court granted summary judgment in each. In the Stewart action, the court granted summary judgment on the ground that the investors could not recover from G.H. Miller because the representative individuals of the putative class did not invest in the pools during the effective date of the G.H. Miller guarantee. In the Cunningham action, the court granted summary judgment on the ground that the individual who perpetrated the fraud did not act within his capacity as an agent for G.H. Miller when conducting the illegal activities. G.H. Miller also moved for Rule 11 sanctions in the Stewart action, submitting that a crucial factual representation in the complaint was false. The district court denied sanctions without explanation. For the reasons set forth in the following opinion, we affirm both of the district court's decisions to grant summary judgment and remand the denial of Rule 11 sanctions for further explanation by the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 In 1982, Dennis K. Tan ("Tan") and partner John Waters ("Waters") started an investment club. The club subsequently began to lose money. Tan and Waters concealed this fact from the club investors by sending them false favorable reports. In 1984, in order to raise more capital, Tan and Waters organized and operated commodity pools. From November 8, 1984 until September 30, 1985, pools were registered with the National Futures Association ("NFA") under the corporate name, "Waters, Tan and Co." ("Waters Tan" or "Waters, Tan & Co.").
 
 
 4
 In May 1985, Dennis Tan registered with the NFA as an introducing broker for G.H. Miller ("Miller"). Pursuant to federal regulation,[1] Mr. Tan entered into a "guarantee agreement"[2] with Miller which provided that, in consideration for Tan's introduction of customer accounts to Miller, Miller would
 
 
 5
 guarantee ... performance by the introducing broker [Dennis Tan] of, and shall be jointly and severally liable for, all obligations of the introducing broker under the Commodity Exchange Act ... with respect to the solicitation of and transactions involving all customer and option customer accounts the introducing broker entered into on or after the effective date of the agreement.
 
 
 6
 The agreement was effective from May 18, 1985 until its termination on July 18, 1986. Upon submission of the registration form, Mr. Tan was assigned an NFA registration number different and distinct from the registration number previously assigned to Waters, Tan & Co. as commodity pool operators. Tan never disclosed the existence of the commodity pools to Miller, and, in fact, actively strove to conceal the pools from Miller.
 
 
 7
 While Tan's guarantee agreement with Miller was effective, Waters Tan used promotional material that falsely stated that Waters Tan, and not Dennis Tan as a sole proprietor, was an introducing broker for Miller. Upon learning of the improper use of the Miller name, a Miller representative immediately warned Mr. Tan to stop portraying Waters Tan as an introducing broker for Miller. He further requested that the material containing the false representation be destroyed. Additionally, in a letter dated March 31, 1986, the NFA censured Tan for representing that Waters Tan, rather than Dennis Tan as a sole proprietor, was the introducing broker guaranteed by Miller.
 
 
 8
 Mr. Tan, through counsel, stated in April 1986 that the reference to Waters Tan as a guaranteed introducing broker for Miller was a "mistake," would not be repeated, and that all literature with improper references had been destroyed. Soon after, Mr. Tan sought Miller's permission to register Waters, Tan & Co. as an introducing broker. Miller refused. The agreement between Mr. Tan and Miller terminated shortly thereafter. Waters, Tan & Co. ultimately registered as an introducing broker with futures commission merchant GNP Commodities; GNP already has settled the suit brought against it by the plaintiffs.
 
 
 9
 In March 1988, the CFTC closed the Waters Tan commodity pools on the ground of fraud. The NFA also charged both Tan and Waters, in their personal capacities, with fraud and expelled them. In 1989, Tan was charged, and pled guilty to, criminal racketeering in Arizona.
 
 
 10
 All of the plaintiffs in this appeal made payments directly to and received certificates from Waters, Tan & Co. None made any payments to Tan individually. None of the trades that form the basis of the allegations in this litigation was placed directly with Miller either through Waters Tan or Tan individually.
 
 B. District Court Proceedings
 
 11
 As noted earlier, this appeal is from two consolidated actions in the district court.[3] In March 1988, a commodities fraud class action was filed in the United States District Court for the Northern District of Illinois (Cunningham v. Waters, Tan & Co.). The original Cunningham complaint did not name Miller as a defendant, but rather GNP Commodities, and Tan and Waters individually. In August of 1989, a second class action was filed in federal court in Arizona (Stewart v. GNP Commodities, Inc.). This complaint named Miller as a defendant. Unlike the claims against other defendants who were accused of some sort of fraud or failure to monitor (GNP Commodities, the NFA, Waters and Tan), the only claim against Miller was that of vicarious liability for the fraud of Waters Tan by its deceptive use of the guarantee agreement between Miller and Tan. The Arizona case, Stewart, was transferred to the Northern District of Illinois and was consolidated with Cunningham.
 
 
 12
 In May 1992, the district court denied class certification. At the same time, the district court granted summary judgment for Miller against the six named plaintiffs in the Stewart action. The district court determined that none of the plaintiffs actually invested in the illegal pools during the term of the Miller-Tan guarantee. Miller also submitted that the Stewart complaint falsely alleged that the six named plaintiffs had invested in pools during the effective period of the guarantee and, on this basis, sought Rule 11 sanctions. That motion was denied without explanation.
 
 
 13
 In the fall of 1992, after the plaintiffs settled with other defendants, a motion to intervene was filed on behalf of more than one-hundred class members. Thirty-five of those individuals who invested in the illegal pools during the term of the guarantee joined the claim of vicarious liability against Miller. In March of 1994, the district court addressed these claims and granted summary judgment for Miller. The court held that Miller could not be liable for losses incurred in commodity pools operated by an entity that it had never guaranteed.
 
 II
 ANALYSIS
 
 14
 Our review of the district court's two decisions to grant summary judgment to 1211 Corporation (formerly Miller),[4] is governed by the de novo standard. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We shall affirm the judgment of the district court if there exists no genuine issue of material fact and if judgment for Miller is proper as a matter of law. see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).
 
 
 15
 Our review of the cross-appeal, Miller's appeal of the denial of Rule 11 sanctions in the Stewart case, is governed by a deferential standard of review. We shall reverse the district court only if it based its decision on a clear error of fact, or if it abused its discretion. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 399-401, 110 S.Ct. 2447, 2457-59, 110 L.Ed.2d 359 (1990); Kapco Mfg. Co. v. C & O Enters., Inc., 886 F.2d 1485, 1491 (7th Cir.1989).
 
 A. The Summary Judgment Decisions
 
 16
 Plaintiffs' submissions all focus on the scope of the guarantee agreement executed between Miller and Dennis K. Tan as sole proprietor. In regard to the Stewart case, the plaintiffs submit that Miller should be vicariously liable under the guarantee agreement for an account opened in the fraudulent Waters Tan commodity pools after the agreement was terminated on July 18, 1986. In regard to the summary judgment in Cunningham, plaintiffs submit that the guarantee agreement's scope extended to Waters Tan, as a distinct corporate entity, as well as to Dennis Tan. In the plaintiffs' view, Miller ought to be held vicariously liable under the agreement for the Waters Tan commodity pool accounts--accounts that Miller never knew existed. We hold that the district court correctly concluded that Miller incurred no liability to any of the plaintiffs and also that the grant of summary judgment was appropriate.
 
 
 17
 Miller executed a guarantee agreement with Dennis K. Tan, introducing broker. The agreement, the terms of which are dictated by CFTC regulations, see 17 C.F.R. Sec. 1.3(mm), provided in relevant part:
 
 
 18
 In consideration for the introduction of customer ... accounts by Dennis K. Tan, an introducing broker, to G.H. Miller, a futures commission merchant ... the futures commission merchant guarantees performance by the introducing broker of, and shall be jointly and severally liable for, all obligations of the introducing broker under the Commodity Exchange Act, ... with respect to the solicitation of and transactions involving all customer ... accounts of the introducing broker entered into on or after the effective date of this agreement.
 
 R. 293, Ex. A.[5]
 1.
 
 19
 We turn first to the plaintiffs' submission that the district court erred in 1992 when it granted summary judgment in the Stewart case on the ground that the plaintiffs did not purchase the securities during the effective dates of the contract. This matter need not detain us long. The plaintiffs' contention is that the illegal solicitations of Emmerson Kumm were within the scope of the Miller guarantee agreement. Mr. Kumm was one of the seven individuals named to represent the putative class that deposited and invested funds in the fraudulent commodities pools operated by Waters Tan.
 
 
 20
 The district court found that the guarantee agreement was in effect from "February 15, 1986 until July 18, 1986."[6] Stewart, Nos. 88 C 1896, 91 C 2635, 1992 WL 121545, at * 5 (N.D.Ill. May 26, 1992). The court stated that it was undisputed that none of the named plaintiffs invested in any of the fraudulent pools until after July 18, 1986. Therefore, it held that, because the agreement "specifically and unambiguously" provided that Miller would be liable for all of Tan's obligations "with respect to the solicitation of and transactions involving all customer and option customer accounts of the introducing broker entered into on or after the effective date of this agreement," Miller could not be liable for solicitations when the account was entered into after the agreement terminated. The court concluded that "[a]ny other interpretation [of the guarantee agreement] would be grammatically untenable." Id.
 
 
 21
 The district court correctly concluded that vicarious liability can be imposed on Miller only for those accounts that were opened during the effective period of the agreement. The guarantee agreement unambiguously provides that liability is limited to "obligations of the introducing broker incurred on or before the date [the] agreement is terminated." We must give effect to such unambiguous contractual terminology. See generally Palda v. General Dynamics Corp., 47 F.3d 872, 874 (7th Cir.1995); Fuja v. Benefit Trust Life Ins. Co., 18 F.3d 1405, 1409 (7th Cir.1994).
 
 
 22
 There is no disagreement among the parties that Mr. Kumm was solicited solely by Dennis Tan in early 1986, during the effective term of the guarantee agreement. However, no investment was made at that time. He finally invested in a fraudulent Waters Tan pool only in early 1987. Miller terminated its guarantee of Tan on July 18, 1986. Further, effective July 18, 1986, Tan was guaranteed as an introducing broker for GNP Commodities. Under CFTC regulation, 17 C.F.R. Sec. 1.10(j)(7), an introducing broker "may not simultaneously be a party to more than one guarantee agreement." Therefore, it would be inconsistent with the regulatory scheme to hold Miller liable for accounts opened during the effective period of a guarantee agreement executed between Dennis Tan and GNP Commodities. We also note that Kumm admitted that he received written notice, by a letter dated July 9, 1986, that Tan was terminating his relationship with Miller and would be affiliated with GNP. There was no genuine issue of material fact with respect to the liability of Miller to the Stewart plaintiffs, and the defendant was entitled to judgment as a matter of law on these allegations.
 
 2.
 
 23
 We turn now to the allegations in the Cunningham case. Here, in contrast to the plaintiffs in the Stewart case, the plaintiffs did purchase securities from Tan during the effective period of the agreement between Tan and Miller. For several reasons, however, we believe that the district court correctly concluded that summary judgment for Miller was appropriate.
 
 
 24
 First--and most fundamentally--the agreement was executed by Miller and Dennis Tan; Waters Tan & Co., the entity with whom the plaintiffs dealt, is a separate legal entity and was not a signatory to the agreement. Second, Dennis Tan registered with the National Futures Association, in his individual capacity, as an introducing broker for Miller; the NFA registration number of Dennis Tan (180439) was separate and distinct from the NFA registration number of Waters Tan as commodity pool operator (90386). Third, because CFTC regulations defining the duties of an introducing broker preclude such individuals from accepting money for commodity pools, see 17 C.F.R. Sec. 1.3(mm), Miller clearly did not assume financial responsibility for commodity pools operated by Waters Tan.
 
 
 25
 We also note that the district court's determination that Miller was not vicariously liable for the commodity fraud of Waters Tan is thoroughly supported by the relevant judicial and administrative decisions. For example, in Taylor v. Vista Futures, Inc., [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 25,165 (Nov. 20, 1991), the Commodity Futures Trading Commission considered the scope of agency of an "associated person" ("AP") employed by an "introducing broker" ("IB") of a "futures commission merchant" ("FCM"). In that case, the AP, separate from his "AP" duties, supervised the operation of a commodity pool. All the trading activity by the AP was conducted through the FCM. After discovering that some funds invested in the commodity pool had been converted, investors sued the AP, the IB, and the FCM. The investors alleged that the guarantee agreement executed between the FCM and the IB made the FCM vicariously liable for the converted funds. The administrative law judge agreed. Upon review, however, the Commodity Futures Trading Commission took the contrary view. It first noted that derivative liability could be established only for transactions that occurred during the period in which the guarantee agreement between the FCM and the IB was effective. The Commission then held that, with respect to the funds converted during the term of the guarantee agreement, the AP was not acting within the scope of his duties as an AP of an introducing broker, but rather within the scope of his duties as an operator of the commodity pools. The Commission noted that Sec. 2(a)(1)(A) of the Commodity Exchange Act and 17 C.F.R. Sec. 13(aa)(2) defined an AP of an introducing broker as "one who solicits orders, not funds." [1990-1992 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 38,430. The AP thus had access to the converted funds because he was performing his duties related to the pool and was not acting "in furtherance of his agency on behalf of the [FCM]." Id.
 
 
 26
 Dennis Tan similarly was authorized as an introducing broker to "solicit orders, not funds." See 17 C.F.R. Sec. 1.3(mm). Furthermore, he had access to the converted funds because he was performing duties related to Waters, Tan & Co. commodity pools, not because of his relationship to Miller. Indeed, unlike the situation in Vista Futures, Dennis Tan did not conduct the illegal commodity pool activity through the FCM. The operation of the commodity pool and the conversion of the invested funds was therefore outside the scope of Dennis Tan's introducing broker relationship with Miller.
 
 
 27
 In assessing the weight that we ought to give to the Commission's decision in Vista Futures, we are mindful that the CFTC's determination of the scope of agency of an introducing broker involves an interpretation of the Commodity Exchange Act, CFTC regulations, and the related guarantee agreement (the terms and form of which are explicitly delineated in CFTC Form 1-FR-IB (Part B)). Accordingly, the holding in Vista Futures is entitled to some deference by this court because of the "special knowledge" which the CFTC brings to the regulation and administration of the commodities markets. Rosenthal & Co. v. CFTC, 802 F.2d 963, 969 (7th Cir.1986); see also Monieson v. CFTC, 996 F.2d 852, 858 (7th Cir.1993).
 
 
 28
 We cannot accept the plaintiffs' submission that our decision in Rosenthal & Co. v. CFTC, 802 F.2d 963, is to the contrary. Indeed, we believe that given the significant factual distinctions between the two cases, its analysis is supportive of the result that we reach today. In Rosenthal, a commodities pool operator agreed to conduct all trades for the pool through Rosenthal, an FCM, in return for the rebate of part of the FCM's regular commission for trading commodity futures. Such a splitting of commissions was permissible under the regulations only if an operator was registered with the Commission as an "associated person" ("AP") of Rosenthal, and then was designated a registered representative of Rosenthal. Rosenthal took these steps. However, he also leased office space for the AP and designated the AP as its "Kansas City branch manager." The individual did not, however, become an employee of Rosenthal, and further, the individual continued to conduct business related to his investment corporations and pools on a separate floor in the building in which Rosenthal had leased space. The relationship between the AP and the FCM began in 1975 and continued through 1978. During that time, the AP sometimes instructed his commodity pools salesmen not to send investors an actual subscription agreement that contained warnings required by CFTC regulations about the risks of commodity trading, until money had been received from the investor. This practice was considered a form of commodities fraud, in violation of sections 4b and 4o of the Commodity Exchange Act, 7 U.S.C. Secs. 6b, 6o. The Commission held that the FCM was vicariously liable for the misconduct that occurred in the commodity pools.
 
 
 29
 In determining the scope of the AP's agency relationship with the FCM in Rosenthal, we considered the totality of the circumstances. Some factors indicated a close agency relationship; others did not. We stated that the fraud was committed in soliciting customers for the AP's pools; the FCM knew about the pools and encouraged the AP to augment the number of existing investors in the pools in order to benefit from the increased number of trades that would result. We also noted, however, that the FCM had no interest in having the commodity pool investors as customers, but rather preferred to earn commissions on the pools through the AP's solicitation of new customers. Although the issue was close, we concluded that the Commission acted reasonably when it determined that the fraud was committed as part of an agency relationship between the AP and Rosenthal. We reasoned that the relationship that the FCM created with the AP was one of broad authority--broader than the simple registration with the commodities exchanges needed to realize a relationship in which the FCM could compensate an individual for his brokerage business by splitting commissions.
 
 
 30
 Our case presents a very different arrangement than the one at issue in Rosenthal. Miller established an introducing broker relationship with Dennis Tan as an individual. That relationship contemplated Tan performing only one function under the aegis of Miller--the solicitation of orders. Miller desired to acquire new customers directly from Dennis Tan. It was never aware that Tan operated commodity pools and had no specific objective to earn commissions from those pools. No arrangement between Miller and Tan contemplated the activity related to the Waters, Tan & Co. pools. The district court was therefore correct when it concluded that the arrangement before it was substantially different than the one in Rosenthal.
 
 
 31
 In similar fashion, Cange v. Stotler & Co., 826 F.2d 581 (7th Cir.1987), supports the defendant's position rather than that of the plaintiffs'. In Cange, the plaintiff sued Stotler, an FCM, to recover losses from unauthorized trades conducted on the plaintiff's account by Stotler's broker-agent who had previously opened the account for the plaintiff. The agent, on his own initiative, and then later upon being confronted with evidence of unauthorized trades, told the plaintiff that the trades were mistakes of Stotler and would be reversed. The broker-agent reneged on an agreement to reimburse the losses on the plaintiff's account, and the plaintiff then sued Stotler under the Commodity Exchange Act. The plaintiff contended that the agent acted with the "express, implied or apparent authority" of Stotler. We held that "it is expectable that when unauthorized trades occur, the FCM's agent handling the account will tell the customer that the losses from any unauthorized trades will be refunded and statements and promises to that effect could certainly be within the scope of the agency." Id. at 590. We reached this conclusion because "[t]he powers of an agent are, prima facie, coextensive with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals." Id. (citing Butler v. Maples, 76 U.S. (9 Wall.) 766, 776, 19 L.Ed. 822 (1869) and Lumbermen's Mut. Ins. Co. v. Slide Rule & Scale Eng'g Co., 177 F.2d 305, 309 (7th Cir.1949)).
 
 
 32
 The situation described in Cange is very different from the one that confronts us in this case. Waters, Tan & Co. possessed no authority from Miller--express, implied or apparent--to conduct business relating to commodity pools; Waters Tan was never an agent of any kind for Miller. Indeed, Dennis Tan, as an individual, possessed no authority from Miller to accept any customer funds; CFTC regulations explicitly prohibited such activity by an introducing broker. 7 U.S.C. Sec. 2; 17 C.F.R. Sec. 1.3(mm). "If a limit known to third parties confines the agent's actual authority, then there is also no authority at all." Cange, 826 at 598 (emphasis in original) (Easterbrook, J., concurring).
 
 
 33
 The same point was considered outcome determinative in the only CFTC proceeding to consider, although briefly, the scope of the Miller guarantee agreement. Hazen v. Waters, Tan & Co., CFTC Docket No. 88-R356 (1988). In Hazen, the plaintiff brought a CFTC action to recover the losses incurred in the fraudulent Waters Tan commodity pools. The administrative law judge stated, in an order dated October 27, 1988, that Miller must "state whether [Waters Tan] was at any time an introducing broker for Miller and, if in the affirmative, whether [Waters & Tan] was guaranteed by Miller." R. 279, Ex. 2. Approximately one month later, after Miller submitted a response demonstrating that Waters Tan never functioned as an introducing broker for Miller, the ALJ ordered the complaint against Miller dismissed. R. 279, Ex. 3. It therefore appears that the only relevant consideration for the ALJ in determining vicarious liability was whether Miller specifically guaranteed the entity that committed the commodity pool fraud. Because the guarantee agreement was executed between Miller and Dennis K. Tan, in his capacity as an individual introducing broker, no further action could proceed against Miller; GNP Commodities' motion for dismissal was denied on the ground that Waters, Tan & Co. was an introducing broker guaranteed by them. Id.
 
 
 34
 In sum, the administrative and judicial decisions support the decision of the district court that Miller, by entering into a guarantee agreement with Tan as an individual, never agreed to guarantee his other venture as a commodity pool operator--an activity of which Miller was never made aware. It is clear that the agreement between Miller and Tan never contemplated such responsibility on the part of Miller. Indeed, by statutory proscription, Dennis Tan, while acting as an introducing broker, was prohibited from accepting money from customers and therefore could not have acted under the Miller contract when he received money for the fraudulent investment pools. As the district court noted, "[a]n arrangement that involves the handling of money is obviously riskier than one not involving the handling of money. Miller ought not have its risk increased without its knowledge." Stewart, 851 F.Supp. at 287. All the commodity pool interests purchased by the plaintiffs were purchased from Waters Tan, the registered pool operator. Additionally, all of plaintiffs' funds were sent directly to Waters Tan, and all certificates of ownership were issued by Waters Tan. The law does not provide remedy to plaintiffs against Miller, a guarantor of an individual introducing broker (Dennis Tan), not pool operator, Waters Tan.
 
 3.
 
 35
 The plaintiffs further submit that Miller is liable under the guarantee agreement because certain terms provide that the agreement "shall be enforceable regardless of the subsequent incorporation, merger or consolidation of ... the introducing broker." Essentially, plaintiffs assert that Waters Tan & Co., as well as Tan, was covered by the Miller guarantee because Dennis Tan merged his operations with Waters Tan. The record does not support the assertion that Dennis Tan, as introducing broker, ever "incorporated, merged or consolidated with any entity after the date of the guarantee." Stewart, 851 F.Supp. at 287.[7]
 
 
 36
 It is clear that Waters Tan, the corporation, preexisted the agreement, and registered with the National Futures Association before the execution of the agreement between Miller and Dennis Tan. There is no evidence that Waters Tan ever registered as an introducing broker of Miller. Without such registration, Waters Tan could not have functioned as the introducing broker of Miller. Upon the execution of the contract, Tan functioned in two capacities (unbeknownst to Miller): as an "associated person" of Waters Tan, a registered commodities pool operator, and as an introducing broker for Miller.
 
 
 37
 The unsupported, conclusory declaration of Waters Tan employee Lee Paulus that "Dennis Tan merged and consolidated his operation of the illegal pools into his companies Waters, Tan & Co. and WTC Investment Group," R. 84, Ex. 3, is not sufficient to create a genuine issue of material fact that Tan merged his introducing broker business into Waters Tan Commodity pool business. The statement never asserts that Tan merged his activity in the illegal pools into his introducing broker activities. Moreover, action taken by both Miller and the NFA indicates that no such merger ever occurred. In April 1986, an employee of Miller, Aaron Itkin, visited the offices of Waters Tan. At that time, Mr. Itkin advised Dennis Tan orally, and in writing three days later, that he must stop representing that Waters Tan was an introducing broker for Miller, and that Tan must destroy any promotional material that falsely indicated that Waters Tan, rather than Dennis Tan, was an introducing broker for Miller. R. 88, Exs. S, S1.
 
 
 38
 The Compliance Department of the NFA also carried out an audit of Waters Tan promotional material after it learned that Waters Tan had been representing that it was an introducing broker for Miller. R. 72, Exs. A, A3. The NFA censured Dennis Tan for distributing material that improperly identified Waters, Tan as introducing broker for Miller. The NFA letter stated, "Dennis Tan is the Introducing Broker guaranteed by G.H. Miller & Co. ... The use of this promotional material by Dennis Tan does not appear to be in accordance with NFA Compliance Rule[s]." R. 72, Ex. A3. In response, Dennis Tan stated that the representation that Waters Tan was an introducing broker for Miller was "wrong" and a "good faith mistake," and that, because of Tan's "highly personal contact with customers," none of Tan's customers was misled to believe that Waters Tan was an introducing broker for Miller. Further, Tan wrote that Waters Tan was an entity that engages "in other business," at least part of which was "unrelated to regulated activity." R. 72, Ex. A4. These facts, in combination with the facts that Tan concealed the existence and operation of the illegal pools from Miller and that Tan approached Miller in 1986 in an attempt to make Waters Tan an introducing broker for Miller but was refused, make clear that none of the parties believed that the purported merger had taken place. All parties conducted themselves as if it had not.
 
 B. The Cross Appeal: Rule 11 Sanctions
 
 39
 The district court, in the same 1992 opinion granting Miller's motion for summary judgment in the Stewart litigation, tersely denied Miller's motion under Rule 11: "Defendants' motion for Rule 11 sanctions is denied." Stewart, Nos. 88 C 1896, 91 C 2635, 1992 WL 121545, at * 6. Although we apply a deferential standard of review to the district court's Rule 11 determinations, Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), this review "is not toothless." Land v. Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Health & Welfare Fund, 25 F.3d 509, 515 (7th Cir.1994) (citing LaSalle Nat'l Bank v. County of DuPage, 10 F.3d 1333, 1337 (7th Cir.1993)). "Deferential review will not prevent this court from ensuring that district judges reflect seriously, and consider fully, before imposing (or denying) sanctions." Mars Steel Corp. v. Continental Bank, 880 F.2d 928, 936 (7th Cir.1989) (en banc).
 
 
 40
 On December 1, 1993, amendments to Rule 11 took effect. Under the old version of the Rule, "imposition of an appropriate sanction is mandatory once the district court determines that the rule has been violated." Land, 25 F.3d at 515.[8] Under the amended Rule, however, the imposition of sanctions is within the discretion of the district court once a violation has been identified. Id.[9] In this case, both the conduct under scrutiny and the decision of the district court not to impose sanctions took place during the effective period of the old rule. Under these circumstances, we believe that it would be neither "just" nor "practicable" to apply the new version of the Rule. See Land, 25 F.3d at 515-16 (citing 146 F.R.D. 404 (April 22, 1993)) (Supreme Court order amending the Federal Rules of Civil Procedure) (ordering that the amended version of Rule 11 governs "all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings in civil cases then pending"). Plaintiffs' counsel's conduct should be judged under the standards applicable when the action took place. See id. (referencing Silva v. Witschen, 19 F.3d 725, 727 (1st Cir.1994)).
 
 
 41
 The basis of Miller's Rule 11 motion was that none of the named representative plaintiffs of the putative class in the 1992 Stewart adjudication invested in the Waters, Tan & Co. commodity pools during the effective period of the Miller guarantee agreement with Tan (May 18, 1985 to July 18, 1986). Paragraph 28 of the document entitled "Class Action Complaint," filed in the United States District Court for the District of Arizona on August 28, 1989, alleged:
 
 
 42
 Beginning in 1985 and continuing until the present, plaintiffs, as several investors in the class of investors which they represent, invested large sums of money with defendants WT Co., Tan and Waters.
 
 
 43
 R. 173, Ex. A. Yet, plaintiffs, on appeal, respond "[i]t is uncontested that all named plaintiffs in Stewart except the Kumms invested in the fake pool accounts in late 1986 or thereafter, after the G.H. Miller guarantee had terminated," and that "[i]t is also obvious from the sentence that it contains a typographical error in that the word 'as' should be 'and.' " Appellees' Answering Br. at 22, 39.
 
 
 44
 Miller's request for the imposition of sanctions appears, on the record before us, to be one worthy of serious consideration. The lack of any statement of reasons by the district court, however, precludes effective appellate review. There are circumstances in which a cursory order granting or denying sanctions without extensive exposition is permissible. See Ross v. City of Waukegan, 5 F.3d 1084, 1088-89 (7th Cir.1993) (citing Teamsters Local No. 579 v. B & M Transit, Inc., 882 F.2d 274, 279 (7th Cir.1989) ("We have even discouraged lower courts from conducting additional proceedings when the record was adequate to determine whether sanctions were necessary.")). We have limited those circumstances to instances in which the "record clearly reflected on its face whether sanctions were appropriate." Id. at 1089. The present appeal does not constitute such a clear case. Accordingly, we must remand this matter to the district court for further consideration.
 
 Conclusion
 
 45
 For the foregoing reasons, we affirm both of the district court decisions to grant summary judgment to Miller. With respect to the Rule 11 cross-appeal, the denial of sanctions is vacated. On remand, the parties may again address the issue of sanctions and obtain a more detailed explanation from the district court regarding its ultimate decision. Miller may recover the usual costs in these appeals.
 
 
 46
 AFFIRMED, in part and VACATED and REMANDED, in part.
 
 
 
 [1]
 The Commodity Futures Trading Commission ("CFTC") regulates the commodity markets pursuant to the Commodity Exchange Act, 7 U.S.C. Sec. 1 et seq., and the accompanying regulations. 17 C.F.R. Sec. 1 et seq. Waters Tan, as a commodity pool operator, registered with the National Futures Association ("NFA"), as required by 17 C.F.R. Sec. 17. 7 U.S.C. Sec. 1a(4) and 17 C.F.R. Sec. 1.3(5)(cc) define a commodity pool operator as:
 any person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery[.]
 Dennis Tan, as introducing broker for G.H. Miller, also registered with the NFA. 7 U.S.C. Sec. 1a(14) and 17 C.F.R. Sec. 1.3(mm) define an introducing broker ("IB") as:
 any person ... engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.
 G.H. Miller, a "futures commission merchant" ("FCM"), was "engaged in soliciting or in accepting orders for the purchase or sale of any commodity," and, unlike an introducing broker, was allowed to accept "any money, securities or property ... to margin, guarantee, or secure any trades or contracts." 7 U.S.C. Sec. 1a(12); 7 C.F.R. Sec. 1.3(p).
 The Code of Federal Regulations, 17 C.F.R. Sec. 1.17 and Sec. 1.10(a)(ii)(C), requires that the introducing broker, as a condition for registration with the NFA, meet minimum financial requirements, or furnish a written guarantee agreement executed between the broker and the futures commission merchant for whom the broker works.
 
 
 [2]
 The terms and form of the guarantee agreement are specifically mandated in CFTC Form 1-FR-IB (Part B)
 
 
 [3]
 A third action was adjudicated by the CFTC. Hazen v. Waters, Tan & Co., CFTC Docket No. 88-R356 (1988). The administrative law judge held that G.H. Miller's guarantee agreement did not make Miller vicariously liable for losses arising from investments in the Waters, Tan & Co. Pools. See discussion infra pp. 1358-59
 
 
 [4]
 Throughout this opinion, we shall refer to 1211 Corporation as "Miller."
 
 
 [5]
 The CFTC requires that introducing brokers maintain a minimum adjusted net capital level of at least $20,000, and allows introducing brokers "to credit towards their capital 50 percent of the value of the guarantee or security deposits which they maintain with an FCM which carries accounts for the introducing broker's customers." [1982-1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 21,792
 The CFTC explained that "[i]n essence, the guarantee agreement provides that the FCM [Miller] which is a party to the agreement will guarantee performance by the introducing broker of its obligations under the Act and the rules, regulations, and order thereunder. As such, the guarantee agreement is an alternative means for an introducing broker to satisfy the Commission's standards of financial responsibility for its activities as an introducing broker." [1982-1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) p 21,792.
 
 
 [6]
 We note that the district court incorrectly identified the starting effective date of the Guarantee Agreement. The language of the Agreement expressly provides that "the agreement shall be effective as of the date registration is granted to the introducing broker." Thus, although the Agreement was signed on February 5, 1995, and its effective date was stipulated as February 15 of that year, the Agreement was not effective until May 18, 1985. The court's error, however, has no effect on this appeal. The error favors the appellants because it added three months to the time in which the court considered fraudulent pool investments during the effective period of the Miller guarantee agreement
 
 
 [7]
 We again note that the contract can support no liability for alleged fraudulent activity that occurred after the termination date of the contract. Therefore, Miller cannot be liable for any activity that occurred after July 18, 1986. The agreement was terminated at that point by mutual consent. The language of the guarantee agreement that unambiguously provides "[t]ermination of this agreement will not affect the liability of the futures commission merchant with respect to obligations of the introducing broker incurred on or before the date this agreement is terminated," permits, under normal principles of contractual interpretation, no other interpretation. See generally Palda v. General Dynamics Corp., 47 F.3d 872, 874 (7th Cir.1995); Fuja v. Benefit Trust Life Ins. Co., 18 F.3d 1405, 1409 (7th Cir.1994)
 
 
 [8]
 The version of Rule 11 in effect for purposes of this case states:
 Every pleading, motion, and other paper of a party represented by an attorney shall be signed.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal or existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including reasonable attorney's fees.
 Fed.R.Civ.P. 11 (1993).
 
 
 [9]
 In relevant part, the amended Rule 11 provides:
 (b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,--
 (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
 (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
 (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
 (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.
 (c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determined that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.
 Fed.R.Civ.P. 11.