In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 01-3668, 01-3735, 02-2956, and 02-3005

BILLY-BOB TEETH, INC.,

*Plaintiff-Appellant,*
*Cross-Appellee,*

*v.*

NOVELTY, INC.,

*Defendant-Appellee,*
*Cross-Appellant.*

Appeals from the United States District Court
for the Southern District of Illinois.
No. 99-963-DRH—**David R. Herndon**, *Judge.*

ARGUED FEBRUARY 27, 2003—DECIDED MAY 21, 2003

Before KANNE, DIANE P. WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* When "International Man of Mystery" Austin Powers gazes at the comely British agent Kensington and purrs "groovy Baby" or "oh behave!" he always smiles, exposing a set of teeth that the best orthodontist in the world could not improve. They are ugly, and therein lies their beauty, at least from a financial point of view. This copyright/trade dress infringement case involves "novelty" teeth—oversized, crooked, and chipped teeth that fit over a person's real teeth. People wear them

to get a laugh. Actor Mike Myers wore them when, as Austin Powers, he foiled the diabolical plans of Dr. Evil to achieve world domination. So where did this all begin? To answer that question we go back 10 years when a dental student named Rich Bailey, for a gag, created a set of novelty teeth.

Jonah White saw the teeth when he went to a football game where, through a mutual friend, he met Bailey, who showed him a set. White testified that Bailey was "just making them as a joke. And I'm kind of a jokester . . . ." White asked for a pair of the teeth and Bailey gave him one. White began to wear the teeth, and "every time I wore them people wanted to buy them from me . . . . They looked so real, and practical jokesters wanted them . . . ." White decided to call Bailey to suggest that the two go into business. White said, "[I]f he would show me how to make these I would make them and we would become part-ners 50/50 . . . ." They did, and White ran the business they called "Billy-Bob Teeth" while Bailey continued with dental school.

White had help from his mother. They ran the business out of her kitchen. White put an 800 line into "one of the hutches in the back of the kitchen, and my mom would answer the phone if I wasn't present when someone called." Of his mother, White testified, "half the time she was my mom, and half the time she was my boss, and half the time she was the secretary." She took orders, typed invoices, was in charge of banking, and went to the little post office in Michael, Illinois, and mailed out orders.

At first, White was making all the teeth himself. He said he would "go out on a weekend and sell more than I can make all week in my parents' attic." Later, he bought machinery like that found in a dental school laboratory. He set up little labs and had about 50 people making teeth. By 1998 or 1999, he was unable to oversee the produc-

tion of enough teeth to meet the demand. Eventually he bridged the ocean, having the teeth produced in Taiwan.

The dental student making snaggly teeth and the kid selling them with his mother's help out of her kitchen was a story made for the media, and the novelty teeth quickly captured national attention. They were featured in *The Wall Street Journal*, *People Magazine*, *Time Magazine*, and numerous television shows, including "The Today Show" and "The Rosie O'Donnell Show." At some point, Billy-Bob secured a license from Newline Cinema. The company's crowning moment came when the looney British secret agent smiled for the camera in Newline Cinema's first *Austin Powers* movie. Before long, Billy-Bob was selling over $5 million a year in novelty teeth. An American success story.

What Bailey, White, and his mom were somewhat less successful at was paperwork and record-keeping. Prior to May 1996, White and Bailey were running the business under the name "Billy-Bob Teeth." In that month, Billy-Bob was incorporated and became "Billy-Bob Teeth, Inc." White and Bailey were the sole shareholders, each owning 50 percent. Nothing about their method of operation changed upon incorporation. However, Bailey, who had by now graduated from dental school, decided he wanted to practice dentistry in Idaho, and in 1997 he pulled out of the business.

Prior to 1995, all the teeth Billy-Bob produced were designed by Bailey. White, however, had designed some in 1995 and in 1997, and those teeth also began to be mass produced. It is White's teeth which are at issue in this copyright case.

On November 16, 1999, Billy-Bob obtained copyright registrations for "Sculpture and Artwork in Novelty Teeth" and "Sculpture and Artwork in Novelty Teeth with Chip." On the registrations the author was described as "Billy

Bob Teeth, Inc., employer for hire of Jonah White." How-ever, Billy-Bob Teeth Inc. did not come into being until after the works were authored. So to straighten things out, during trial of this matter, on May 31, 2001, White, as owner, signed a nunc pro tunc copyright assignment, assigning his works to Billy-Bob Teeth, Inc.

Billy-Bob teeth are sold in what is described as a clam-shell plastic package with an insert card. Bailey is pic-tured on the back wearing glasses and the novelty teeth. The first prototype of the packaging cost $5,000 to make.

The defendant in this suit, Novelty Inc., entered the picture in 1999 when it contacted White to extract from him samples of Billy-Bob teeth. Novelty sells items to 5,000 gas stations, and it wanted to sell Billy-Bob products. White was eager to land such a large account, so he sent samples. When he called Novelty to see what was happen-ing with the proposed deal, White was told that the owner of Novelty, Todd Green, was not interested. Green appar-ently said to one of his employees that the teeth were a great idea, but he was already working on a set of his own. Billy-Bob calls that false and says what Green was ac-tually working on was copying Billy-Bob teeth. Novelty contacted its Taiwan manufacturer with instructions to change the Billy-Bob teeth enough so the resulting prod-uct would not be seen as copies. Novelty ordered 90,000 "Bubba Teeth" from the Taiwan company. Billy-Bob complains that not only were Bubba teeth copies, but they were shoddy copies as well. Later, Novelty ordered a large number of "Hilljack Teeth," which Billy-Bob said also infringed its copyright. Not only that, Billy-Bob says, Novelty also copied the clamshell packaging and the insert. All of this caused Billy-Bob to receive complaints about the quality of its teeth when in fact the problem was with Bubba and Hilljack teeth.

When Novelty started flooding the market with shoddy teeth, White says, in testimony which was excluded from

the trial, he was engaged in licensing negotiations with one of his distributors, Gregory O'Dell, who was going to pay $500,000 for the right to buy the teeth directly from Billy-Bob's Taiwanese importer and sell them under the Billy-Bob name. When O'Dell discovered that Novelty's teeth were cheaper, the deal "came to a screeching halt."

Billy-Bob sued, alleging copyright and trade dress infringement. The case went to trial before a jury. As we just said, the evidence regarding the $500,000 O'Dell deal was excluded. The jury, however, awarded Billy-Bob $105,000 in damages for copyright infringement on Novelty's sale of Bubba Teeth, $30,000 in damages on the sale of Hilljack Teeth, and $7,046.40 in damages for trade dress infringement. Novelty moved for judgment as a matter of law or for a new trial. The motion was granted in part on the basis that the copyrights were invalid because neither of the works was a "work made for hire." In addition, the judge conditionally granted the motion for a new trial. The damage award for trade dress infringement was upheld.

The district court concluded that Billy-Bob Teeth, Inc. could not show an ownership interest in the copyright. The corporation did not exist when White made the teeth so the teeth could not be a "work made for hire" under 17 U.S.C. § 101. Even if White attempted to assign his interest in the teeth to the corporation during trial, the district court said that for the assignment to be valid there would need to be evidence of a prior oral agreement to transfer ownership. The only evidence on this point was White's testimony, which the district court found was not sufficiently reliable to lead to a conclusion that there was an oral agreement. As to the trade dress claim, the district court upheld the jury's verdict for Billy-Bob. This appeal by Billy-Bob and a cross-appeal by Novelty followed.

We review a grant of judgment as a matter of law *de novo*, viewing the evidence and drawing all reasonable inferences in Billy-Bob's favor. We review a grant of a new trial for an abuse of discretion. A new trial may be granted only when the verdict is against the manifest weight of the evidence. *Mathur v. Board of Tr. of S. Ill. Univ.*, 207 F.3d 938 (7th Cir. 2000).

A copyright "vests initially in the author or authors of the work." 17 U.S.C. § 201. Under the "work made for hire" provisions in 17 U.S.C. § 101, employers are considered authors. A "work made for hire" is a work prepared by an "employee within the scope of his or her employment" or a "work specially ordered or commissioned" within nine specified categories. *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 738 (1989). When a work falls within the nine categories, it can be a work made for hire if "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." § 101. For an item to be a commissioned work, then, the parties must agree in advance that that is what it will be. *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992).

For a number of reasons, Billy-Bob, Inc. cannot claim that the teeth are works made for hire. First of all, the corporation did not exist when the teeth were authored. As we said, White authored the teeth in 1995. Billy-Bob was incorporated in May 1996. Even if that basic problem did not exist, the teeth do not fall within the nine categories for commissioned works, nor could there have been an advance agreement between Billy-Bob, Inc. and White that they would be commissioned works. The work-made-for-hire provisions are not relevant to this case and, in fact, Billy-Bob does not argue that they are.

An error on the registration is not fatal to Billy-Bob's case, however. As the court in *Urantia Foundation v.*

*Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997), incisively stated, the "case law is overwhelming that inadvertent mistakes on registration certificates do not . . . bar infringement actions, unless the alleged infringer has relied to its detriment on the mistake, or the claimant intended to defraud the Copyright Office by making the misstatement." *See also*, *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994); *Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452 (2nd Cir. 1989).

So Jonah White is the author of the teeth in question and, in this case, Billy-Bob, Inc. claims ownership of the copyright by assignment from White. Copyrights, like other property rights, can be transferred from an owner to another entity. 17 U.S.C. § 201; *Schiller & Schmidt*. Section 204 set out the requirements of a transfer:

> A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent.

As the statute indicates, an oral assignment may be confirmed later in writing. In *Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1532 (11th Cir. 1994), the court recognized that "17 U.S.C. § 204(a) can be satisfied by an oral assignment later ratified or confirmed by a written memorandum of the transfer." Similarly, in *Imperial Residential Design, Inc. v. Palms Development Group, Inc.*, 70 F.3d 96, 99 (11th Cir. 1995), the court agreed that "a copyright owner's later execution of a writing which confirms an earlier oral agreement validates the transfer ab initio."

As we have noted, White, as the "author" of the teeth in question, executed a nunc pro tunc document in 2001 memorializing that as of May 31, 1996, he assigned his copyrights to Billy-Bob, Inc.:

I, Jonah White, being an author of works of author-
ship for: (I) "Sculpture and Artwork in Novelty Teeth,"
which work is now the subject of U.S. Copyright Cer-
tificate of Registration No. VA 771-490, registered on
November 16, 1999; (ii) "Sculpture and Artwork in
Novelty Teeth With Chip," which work is now the
subject of U.S. Copyright Certificate of Registration
No. VA 771-491, registered on November 16, 1999; and
(iii) "Sculpture and Artwork in Novelty Teeth With
Cavity," which work is now the subject of U.S. Copy-
right Certificate of Registration No. VA 985-694,
registered on January 27, 2000 (collectively the
"Works"), for good and valuable consideration, receipt
of which is hereby acknowledged, affirm that on or
about May 31, 1996, I did sell, assign, and set over to
Billy-Bob Teeth, Inc., a corporation organized and
existing under the laws of the state of Illinois, all
right[s], title and interest in, to, and under the Works
and Certificates of Registration, including any supple-
mental registrations thereof, I did then have, or
would acquire in the future, including, but not limited
to, all ownership, U.S. and international copyrights,
moral, attribution and/or integrity rights, and the
right to sue for past, present and future infringement
(Pl. Ex. 71 (Apdx 85)).

The district court rejected the assignment, however,
saying there was no reliable evidence of a prior agreement
which could be memorialized by the document White
provided. Our *de novo* review of the record leads us to
a different conclusion. First of all, a corporation cannot
literally discuss anything with anyone. White and Bailey
are the only players here who can discuss anything. White
testified that "[e]verything that we had [at the time
of incorporation]—all the work that we had achieved and
we had done just—we just—it all became property of Billy-
Bob Teeth, Inc." This statement is consistent with the

manner in which other aspects of this business were handled. In saying that this evidence was not reliable, the district judge improperly weighed the evidence, judged the credibility of the witness, and therefore invaded the province of the jury.

The jury was instructed that:

> On Billy-Bob Teeth's copyright infringement claim, Billy-Bob Teeth has the burden of proving each of the following by a preponderance of the evidence:
>
>> 1. Billy-Bob Teeth is the owner of a valid copyright;
>>
>> 2. Novelty had access to the work that it is alleged to have copied; and
>>
>> 3. Novelty used its access to copy the copyrighted work.

Novelty does not raise a challenge to the jury instructions. And, the jury apparently believed that Billy-Bob Teeth, Inc. was indeed the owner of the copyrights.

Even if all this were not true, Novelty, nevertheless, would lose on this point. It simply does not having standing under § 204. The statute is in the nature of a statute of frauds and is designed to resolve disputes among copyright owners and transferees. As the court said in *Imperial Residential Design*, "the chief purpose of section 204(a), (like the Statute of Frauds), is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." The court went on to say that, where there is no dispute between the copyright owner and the transferee about the status of the copyright, "it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement." 70 F.3d at 99. *See also Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2nd Cir. 1982).

That there is no dispute between White, Bailey, and Billy-Bob, Inc. is clear. White, the author, repeatedly said at trial that, upon incorporation, the copyrights were transferred to the corporation. He also testified that, even though Bailey is not part of the business any longer, "he and I are best friends, and I have financially supported him very well with profits from the business, even after he left in 1997." Later, White indicated that he has given Bailey about $400,000 over the years. This record simply does not support judgment as a matter of law on this point.

Furthermore, the grant of a new trial depends, in part, on these same legal issues. It depends, as well, on the judge's conclusion that the testimony of White regarding the assignment is not sufficiently reliable to support the verdict. When we place the testimony in the context of the correct legal principles, we must disagree with that conclusion. We find that the grant of a new trial in this instance was an abuse of discretion.

Novelty also appeals the district court's denial of its motion for judgment as a matter of law on Billy-Bob's trade dress claim. On appeal, Novelty says that, in denying the motion, the district court improperly allocated the burden of proving that the clamshell packaging was not functional and therefore not protectable. Arguably that is true. An amendment to the Lanham Act in 1999 states that "the person who asserts trade dress protection [here Billy-Bob] has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3). The district court made a statement that the defendant could have an affirmative defense that the packaging is functional—thus placing the burden of proof on the defendant on this issue. But this is not where this story should begin.

The finding of trade dress infringement came from the jury. Novelty does not argue that the jury was improperly instructed. And, in fact, the jury was instructed correctly:

On Billy-Bob Teeth's claim for trade dress infringement, Billy-Bob Teeth has the burden of proving each of the following by a preponderance of the evidence:

. . . .

4.  Billy-Bob Teeth's trade dress is non-functional.

The jury found for Billy-Bob, and sufficient evidence exists to support the verdict.

What Novelty has done is to appeal the denial of its motion for judgment as a matter of law on the basis that the judge made an error of law in his decision on that motion, even though Novelty knows full well that the jury was properly instructed on the point. It is difficult to see how an arguable error in a decision on a post-verdict motion upholding the verdict of a properly instructed jury affects anyone's rights.

The remaining issue is whether the evidence regarding Billy-Bob's lost deal with Gregory O'Dell was properly excluded. This ruling is reviewed under the abuse of discretion standard. *See Cummins v. Lyle Indus.*, 93 F.3d 362, 367 (7th Cir. 1996). Although, as our case law makes clear, the abuse of discretion standard is not without teeth, it does remind us that we are not making our call on a clean slate. *See Cunningham v. Waters Tan Co.*, 65 F.3d 1351, 1360 (7th Cir. 1995). We must give deference to the view of the district court.

The issue was considered at least twice in the district court. A hearing was held on March 15, 2001, on a motion to exclude Billy-Bob's expert witness on damages. As relevant here, Novelty claimed that Billy-Bob did not provide underlying documentation of the $500,000 lost licensing opportunity or other relevant documentation. The district judge did not exclude the expert's report in its entirety but did exclude evidence of the lost $500,000 licensing fee "because it admittedly seems to come right

out of the blue." The second time the issue was considered was at trial. Billy-Bob presented testimony from O'Dell and White as an offer of proof as to the existence of the possibility of a $500,000 licensing fee which was lost because of Novelty's infringing products. Again, the district judge excluded the evidence on the basis of the "failure to timely disclose this information to the defendant . . . ."

The transcript of the March hearing shows that little attempt was made to help the district judge determine when the information was provided to Novelty. At one point, when the judge was expressing concern about the evidence, he said, "I think it would have been better to supplement the interrogatories with more specifics, but that at the very least, is there any way you can defend that aspect of the report?" Billy-Bob's answer, "No Your Honor." Given that sort of response, how else was the district judge to rule? At the very least, no one would see the disclosure of this information as a sparkling example of the discovery rules at work. Based on our review of the record, we cannot find that it was an abuse of discretion to exclude the evidence.

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART; the jury verdict in Billy-Bob's favor for the full amount of $142,046.40 is REINSTATED. Costs to the plaintiff-appellant, Billy-Bob Teeth, Inc.

A true Copy:

      Teste:

                            _____
                            *Clerk of the United States Court of Appeals for the Seventh Circuit*