ATTORNEY FOR APPELLANT
Robert T. Faulkner
Evansville, Indiana

ATTORNEYS FOR APPELLEE
Catherine Nestrick
Andrew Ozete
James E. Gentry, Jr.
Evansville, Indiana



FILED

May 19 2009, 10:26 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 82S04-0806-CV-00309

DENNIS CONWELL AND FRANK SPLITTORFF,
D/B/A PIECE OF AMERICA,

*Appellant (Defendant below),*

v.

GRAY LOON OUTDOOR MARKETING GROUP,
INC.,

*Appellee (Plaintiff below).*

Appeal from the Vanderburgh Superior Court, No. 82D03-0503-PL-1340
The Honorable Robert J. Pigman, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 82A04-0609-CV-00488

**May 19, 2009**

**Shepard, Chief Justice.**

As the Internet becomes a ubiquitous presence in American commerce, the nation's courts work to find satisfactory legal frameworks for resolving the disputes that inevitably arise. In this suit between a business enterprise and the marketing firm that created and hosted its website, we conclude that the Uniform Commercial Code does not apply and that the web design

firm may collect for its work under principles of common law contract. As for a counter-claim alleging conversion of the intellectual product, we conclude that copyright law supports ownership by the designer. We affirm the trial court's judgment for the marketing firm.

**Facts and Procedural History**

In November 2003, Piece of America was a limited partnership pursuing the sale of novelty packages: one-square-inch parcels of land in each of the fifty states. The general partners were F.W. Splittorff, Dennis Conwell, and Robert Aswell. To market and sell its products, Piece of America sought to establish a website. None of the partners had any sophistication in Internet technologies or website design, so they approached Gray Loon Marketing, which provides various marketing and communication services, to design and publish its website. In September 2003, Gray Loon gave POA a design proposal for the website and an estimated price of $8,080. Among other things, Gray Loon's proposal for POA's package stated, "It is Gray Loon's philosophy that clients have purchased goods and services from us and that inherently means ownership of those goods and services as well." (Appellants' App. at 59.)

Piece of America agreed to the proposal and paid a 50% deposit, and design commenced. During the design process, POA asked for a few minor changes, none of which requests were written down. Gray Loon finished the site in December 2003 at a final cost of about $8,500. Once the website was running to POA's satisfaction, it paid Gray Loon in full during the first quarter of 2004. Both parties undisputedly fulfilled their obligations under the agreement of November 2003.

In April 2004, POA requested that Gray Loon make several changes, some of which required major programming work. In particular, POA wanted to allow customers to make two payments in purchasing its packages. Gray Loon agreed over the phone to make these changes, and, following its policy, Gray Loon immediately began the requested alterations. Piece of

2

America did not request a proposal or a quote, and Gray Loon did not provide one. Gray Loon did produce an internal memorandum outlining the changes, but did not supply it to POA. Piece of America did not request that Gray Loon save a copy of the original website before it made the alterations, and Gray Loon does not regularly do so without such a request. Once Gray Loon completed the modifications, Gray Loon contacted POA for approval to post the modifications. At that time, POA told Gray Loon that it did not want to implement the system for two payments by consumers. Gray Loon subsequently sent POA a bill for $5,224.50.

Gray Loon made several phone calls attempting to collect the bill. Gray Loon owner Jonathan Ruthenburgh talked to Dennis Conwell (the contact person representing POA to Gray Loon) a week or so after the net 30 days invoice went unpaid – that is, sometime in July 2004. Conwell stated he did not have any issues with the invoice, but POA needed time to obtain additional funds. In August 2004, Conwell advised Gray Loon that he would no longer be the contact person. Piece of America does not contest that Conwell had authority to deal with Gray Loon on behalf of the partnership at the time he accepted the invoice terms.

During this period, Gray Loon was also charging POA seventy-five dollars a month for hosting the site. Once Gray Loon published the modified website, it remained available from July to September 2004.[1] Piece of America neither negotiated a payment schedule, nor did it tell Gray Loon anything more than that it needed time.

---

[1] The trial court's finding of fact 16 states that Gray Loon made "the completed website" available on the Internet between July and September of 2004 without addressing Piece of America's change of heart regarding the two-payment structure. (Appellants' App. at 9.) The record does not specify precisely when the completed site replaced the original or when the original files became unavailable. Gray Loon asserts that it could not deliver the original files when Piece of America first requested them, and POA does not challenge this assertion.

After several failed attempts to get a commitment that payment would be made, Gray Loon sent a letter by certified mail on September 29, 2004, advising POA that if payment was not made by October 6th, the website would "be taken offline and other means of collection will be initiated." (Appellants' App. at 63-64.) Piece of America did not pay for either the modifications or Gray Loon's hosting fee, and Gray Loon took the website offline on October 6, 2004. Piece of America never requested the site files in the course of these events, but if it had, Gray Loon asserts the files would have been unavailable at the time Gray Loon took the site offline.

Gray Loon filed suit for non-payment, naming Splitorff, Conwell, and POA.[2] Piece of America countersued for conversion, claiming Gray Loon had taken the original website, for which it had paid.

The trial court entered judgment for Gray Loon on its claim and against POA on its counter-claim. The Court of Appeals affirmed. Conwell v. Gray Loon Outdoor Mktg. Group, No. 82A04-0609-CV-488 (Ind. Ct. App. Sept. 7, 2007). We granted transfer.

To resolve this case, we must determine which law applies in interpreting the agreement between the parties. Then, we must consider whether the applicable law recognizes a contract here and whether POA should be required to pay Gray Loon. Finally, we must consider whether Gray Loon committed conversion by taking down the website and not making a copy of the original site for POA.

---

[2] Aswell was not named in the suit.

**A World of Websites**

We start with a short introduction of the relevant background regarding websites.[3]  As befits the subject, we begin by reference to Merriam-Webster's Online Dictionary, which defines a website as "a group of World Wide Web pages usually containing hyperlinks to each other and made available online by an individual, company, educational institution, government, or organization."  http://www.merriam-webster.com/dictionary/web%20site.[4]  It defines the World Wide Web as "a part of the Internet accessed through a graphical user interface and containing documents often connected by hyperlinks."  http://www.merriam-webster.com/dictionary/world%20wide%20web.

A web page consists of computer programming that is decoded by an Internet browser to show the "graphic user interface" that ranges from a simple combination of graphics and text to interactive applications.[5]  For our purposes, there are essentially two aspects of a website:  the content that the pages on a website display and the programming that encodes it in such a way for a browser to interpret.  In some web design relationships, the hiring party provides all content while the designer simply translates it into a format appropriate for viewing in the World Wide Web.  On other occasions, the hiring party provides a vision and a goal for the site and the

---

[3] Our opinion in Felscher v. Univ. of Evansville, 755 N.E.2d 589, 595 (Ind. 2001), included a section entitled "Internet 101" containing further background.

[4] When a new term enters the language, it sometimes takes a while before one convention or another becomes the standard of educated usage.  The Merriam-Webster entry is "web site," but Oxford Dictionaries shows "website" as the standard form, starting in its Concise Oxford Dictionary, (11th ed. 2004).  http://www.askoxford.com/asktheexperts/faq/usage/website?view=uk.  This opinion follows the latter formulation.

[5] Rinaldo Del Gallo, III, Who Owns the Website:  The Ultimate Question When a Hiring Party Has a Falling-Out with the Website Designer, 16 J. Marshall J. Computer & Info. L. 857, 859 (1998) "A website is comprised of computer software sitting on one computer terminal ready to be accessed by the World Wide Web similarly to the way software is made available to many computers on a LAN contained within a single office."

designer creates both the content and the programming. The latter characterization seems to fit the facts here, though POA provided some content.

The website at issue here was distributed by Gray Loon for free to any Internet user who directed an Internet browser to POA's domain. Piece of America paid Gray Loon to author and to distribute (or "host") the website files via its server, making it available to any computer connected through the Internet. Piece of America could have bifurcated these two tasks and hired a third party to host the site or to design it. If it had hired a third company to host the site for distribution over the Internet, it would have had to transfer the files to the other company's servers. Gray Loon could have copied them to a disk and physically delivered it or transferred the files over the Internet using any number of methods.

Inasmuch as the information technology industry runs to hundreds of billions of dollars a year in projects, it is quite ordinary that clients and providers often find themselves locked in disputes. The leading source of statistics about the industry, the Standish Group, reports in its 2009 analysis of information technology performance that 32% of engagements result in a timely product billed more or less on budget.[6] Their historic analysis reflects outright cancellation by clients about 20% of the time and projects completed very late or substantially over budget about 50% of the time.

## Contract Law

The common law of contracts governs agreements between private parties, except to the extent that it has been modified by legislation (like the Uniform Commercial Code). Piece of

---

[6] The Standish Group International, Inc., *Chaos Summary 2009*, April 23, 2009, http://www.standishgroup.com/newsroom/chaos_2009.php.

America argues that the contract it made with Gray Loon should be considered as one for services, such that the common law of contracts should apply. (Transfer Pet. at 7-8.) Further, it asserts that the common law strictly requires essential elements of a contract, one of which is price, in order to form an enforceable agreement, and that price was not agreed to in the instant case. (Reply Br. at 3.) For its part, Gray Loon simply advances a general contract argument that it effected the website changes at POA's request and was not paid for the work. (Appellee's Br. 8-11.)

The trial court applied the U.C.C. in its conclusions of law. (Appellant's App. at 11-12.) The Court of Appeals did likewise. Conwell v. Gray Loon Outdoor Mktg. Group, Inc., No. 82A04-0609-CV-488 (Ind. Ct. App. Sept. 7, 2007). We will begin by considering whether the U.C.C. was the right law to deploy.

## I. Does the U.C.C. Govern this Agreement?

Indiana's U.C.C. Article 2 "applies to transactions in goods." Ind. Code. § 26-1-2-102 (2008). Goods "means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale, other than the money in which the price is to be paid, investment securities (IC 16-1-8.1) and things in action." Ind. Code § 26-1-2-105 (2008).

Where close questions arise about whether a transaction involved the transfer of goods or performance of services, courts commonly choose one or the other by asking what was the "predominant thrust." Compare, e.g., Ogden Martin Systs. of Indianapolis, Inc. v. Whiting Corp., 179 F.3d 523, 530-531 (7th Cir. 1999) (predominant thrust of installation of solid waste handling cranes was the goods), and Insul-Mark Midwest, Inc. v. Modern Materials, Inc., 612 N.E.2d 550, 556 (Ind. 1993) (predominant thrust of coating of screws was the service).

Arguably, software could be treated as a good, or not, depending on how it is created or transmitted. Where software is contained in a tangible medium, especially when produced on a mass scale, courts have had a difficult time placing software into the established categories. Unsurprisingly, this challenge has prompted suggestions that a new legal paradigm may be needed. The National Conference of Commissioners of Uniform State Laws has been working on this issue for some time with what was originally called U.C.C. Article 2B, later renamed the Uniform Computer Information Transaction Act after the American Law Institute withdrew from the project. Maureen A. O'Rourke, An Essay on the Challenges of Drafting a Uniform Law of Software Contracting, 10 Lewis & Clark L. Rev. 925, 929-30 (2006). The ALI has subsequently launched a project titled "Principles of the Law of Software Contracts," to accomplish a similar end.[7]

Happily, this case does not include any of the aspects (like the legal effect of an agreement to transfer software on a tangible medium) that have complicated resolution of the U.C.C.'s applicability in some cases reported in the literature. We thus can address the goods/services question rather cleanly.

Our Court of Appeals has decided at least two cases on whether software is a good. Piece of America points us to a decision from two decades ago, Data Processing Servs., Inc. v. L.H. Smith Oil Corp., 492 N.E.2d. 314 (Ind. Ct. App. 1986).[8] Data Processing Services involved custom software used in the operations of an oil company. The court determined that the sale for customized computer software was not a sale for goods. It said the transaction was "more

---

[7] Id. at 930; The American Law Institute, Principles of the Law of Software Contracts, (2009), http://www.ali.org/index.cfm?fuseaction=projects.proj_ip&projectid=9.

[8] The Court of Appeals decided Data Processing before it had settled on the predominant thrust analysis over a bifurcated analysis, as noted in its Insul-Mark Midwest, Inc. v. Modern Materials, Inc., 594 N.E.2d 459 (Ind. Ct. App. 1992). Our decision in Insul-Mark determined the predominant thrust test as the proper analysis, and the Court of Appeals expressly recognized this in Olcott Int'l & Co., Inc. v. Micro Data Base Sys., Inc., 793 N.E.2d 1063, 1071 n.4 (Ind. Ct. App. 2003).

analogous to a client seeking a lawyer's advice or a patient seeking medical treatment." Id. at 319. It further stated:

> While a tangible end product, such as floppy disks, hard disks, punch cards or magnetic tape used as a storage medium for the program may be involved incidentally in this transaction, it is the skill and knowledge of the programmer which is being purchased in the main, not the devices by which this skill and knowledge is placed into the buyer's computer. The means of transmission is not the essence of the agreement.

Id.

The Court of Appeals treated the agreement as a contract for services because that is how the language of the contract suggested the parties themselves understood it; they used terms such as "to act," and treated the object of the contract as the programmer's knowledge, skill, and ability. It also relied on common law principles of implied warranty of skill and diligence by "those who hold themselves out to the world as possessing skill and qualifications in their respective trades or professions." Id. at 319-20.

In a more recent case, the Court of Appeals considered a contract that licensed one software company to use another's software modules in its own end product. Olcott Int'l & Co., Inc. v. Micro Data Base Sys., Inc., 793 N.E.2d 1063, 1071 (Ind. Ct. App. 2003). In concluding that U.C.C. Article 2 applied to the contract, the Court of Appeals relied on both parties' acquiescence in that conclusion and reasoned that because the agreement involved pre-existing, standardized software modules, they were goods rather than services. Id.

On the surface, these cases might suggest that customized software is a service while pre-made software is a good, but when courts try to pour new wine into old legal bottles, we sometimes miss the nuances. It would be a mistake, for instance, to treat software as a good simply because it was contained in a tangible medium that fits within that category. This would

conflate the sale of a book with the sale of its intellectual content, suggesting that the purchaser of the book might be buying a right to general use of the expressions contained in the volume.

A website created under arrangements calling for the designer to fashion, program, and host its operation on the designer's server is neither tangible nor moveable in the conventional sense. To be sure, one can copy a website using tangible, movable objects such as hard drives, cables, and disks. These objects are in themselves just as certainly goods, but it does not necessarily follow that the information they contain classifies as goods as well. The arrangement between POA and Gray Loon contemplated a custom design for a single customer and an ongoing hosting relationship. As such, conventional "predominant thrust" doctrine suggests that the U.C.C. did not apply.

## II.     Was There an Enforceable Agreement to Modify the Site?

We proceed to examine Gray Loon's claim for payment under common law principles. The basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties. Rosi v. Bus. Furniture Corp., 615 N.E.2d 431 (Ind. 1993). Whether a contract exists is a question of law. Orr v. Westminster Village North, Inc., 689 N.E.2d 712 (Ind. 1997).

To be valid and enforceable, a contract must be reasonably definite and certain. Wenning v. Calhoun, 827 N.E.2d 627 (Ind. Ct. App. 2005); See Wolvos v. Meyer, 668 N.E.2d 671, 675-76 (Ind. 1996). All that is required to render a contract enforceable is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom; absolute certainty in all terms is not required. Only essential terms need be included to render a contract enforceable. Illiana Surgery & Med. Ctr., LLC. v. STG Funding, Inc., 824 N.E.2d 388 (Ind. Ct. App. 2005). Thus, where any essential element is omitted from a contract, or is left obscure or undefined, so as to leave the intention of the parties uncertain as to any substantial term of the

10

contract, the contract may not be specifically enforced. Johnson v. Sprague, 614 N.E.2d 585 (Ind. Ct. App. 1980). A court will not find that a contract is so uncertain as to preclude specific enforcement where a reasonable and logical interpretation will render the contract valid. See Donavan v. Ivy Knoll Apartments P'ship, 537 N.E.2d 47 (Ind. Ct. App. 1989).

Piece of America contests on several grounds the trial court's finding that it had a contract with Gray Loon. First, it states: "There was no evidence of any writing executed by any party which would have modified the contract by increasing the scope of work." (Reply Br. at 3.) It cites as analogous Kern v. City of Lawrenceburg, 625 N.E.2d 1326 (Ind. Ct. App. 1993), in which the Court of Appeals required a subcontractor to obtain a written change order to receive payment for water hauling services that were not included in the subcontract and precluded recovery for water hauling services on *quantum meruit* theory because the express contract covered the subject matter. An essential difference between this case and Kern is that Kern's contract explicitly called for a change order in writing. Here, such a requirement did not exist. The only formal agreement between these parties was the 2003 document under which both parties performed. We see the 2004 request for changes to the completed website as a new transaction rather than an "expansion of scope."

Second, POA asserts that Gray Loon "has not demonstrated there was any oral or written agreement on a price for the modifications it alleges were requested, consequently, [Gray Loon's] claim for making those changes must fail." (Reply Br. at 4.)

The evidence in the record concerning whether the parties regarded price as essential, such as it is, favors the trial court's judgment. Piece of America asked Gray Loon for the changes it made and did not inquire into how much it would cost. The only evidence submitted regarding the reasonableness of the price consists of the invoice itself and POA's acceptance of the price through Dennis Conwell after receiving the invoice. There is no evidence that Gray Loon participated in any unconscionable effort to "strong-arm" POA into paying an

11

unreasonable fee.  In light of all that, the trial court was right to enforce the agreement even though Gray Loon had not provided a cost estimate.[9]

### III.     Did Gray Loon Commit Conversion?

Piece of America appeals the trial court's denial of its counterclaim, which alleged that Gray Loon converted its property by failing to make a backup copy of the original version of the website, for which it made payment.  (Appellants' Br. at 11-12; Appellants' App. at 17-18.)  A person who loses property as a result of criminal conversion "may bring a civil action against the person who caused the loss" for up to three times the amount of the damage, plus the costs of the action, reasonable attorney's fees, and certain other costs.  Ind. Code § 34-24-3-1 (2008).  Such a claimant must show the elements of conversion by a preponderance of the evidence. Romanowski v. Giordano Mgmt. Group, LLC, 896 N.E.2d 558 (Ind. Ct. App. 2008). Our Code provides that a "person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion."  Ind. Code § 35-43-4-3 (2008).

The action that POA argues constitutes conversion amounts to Gray Loon's "destruction" of the paid-for website.   Piece of America claims that Gray Loon "specifically and unambiguously represented that POA owned the work product."  (Transfer Pet. at 3-4, citing Appellants' App. at 59.)  While this is true, Gray Loon's representation did not vest ownership in POA.

---

[9] Piece of America is right to challenge the trial court's order requiring it to pay for the modifications without ordering Gray Loon to do anything.  (Appellants' Br. at 9, citing Appellants' App. at 7-13.) Should it pay the judgment, POA would be entitled to the website as modified.

The Copyright Act of 1976 protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a) (2006). The protection extends to a broad array of subject matter including pictorial, graphic, sculptural, and literary works, § 102(a)(1), which includes computer programs.[10] See qad, inc. v. ALN Assocs., Inc., 974 F.2d 834, 835 (7th Cir. 1992). Although authors who follow certain formalities, such as registering with the U.S. Copyright Office, may see additional benefits, material receives copyright protection without authors taking these steps. See 1 Paul Goldstein, Goldstein on Copyright § 1.2 (3d ed. 2008). Because ownership is at the heart of POA's claim, we analyze how copyright law affects the legal status of the site.

## Copyright Ownership

Piece of America's claim to ownership of the website might rest on two concepts in copyright law. First, the site could be a "work made for hire," in which it is the original owner. Second, Gray Loon could have been the initial owner but transferred ownership to POA.

## Work Made for Hire

Under the Copyright Act a "work made for hire" is "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The Act further provides that "[i]n the case of a work made for hire, the employer or other person for

---

[10] The Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101.

whom the work was prepared [here, POA] is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." See 17 U.S.C. § 201(b).  Copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201(a).

A copyright gives the owner exclusive rights to reproduce the work, to prepare derivative works based on the original, to distribute copies of the work to the public, and to display the work publicly. See 17 U.S.C. § 106.

In determining whether a work is a "work made for hire" under the Copyright Act a court must first examine whether the seller is an employee or an independent contractor under rules of agency law. If the work was within the scope of employment, an agency law employee is a copyright employee, and the employer is the "author," according to 17 U.S.C. § 101(1).  By contrast, works specially ordered or commissioned from independent contracts are not works for hire unless the work comes within one of the nine narrow statutory categories and parties agree in a signed instrument. 17 U.S.C. § 101(2).[11]  Cmty. for Creative Non-Violence v Reid, 846 F.2d 1485 (D.C. Cir. 1988), aff'd. 490 U.S. 730 (1989), quoting Easter Seal Soc. for Crippled Children & Adults, Inc. v. Playboy Enters., 815 F.2d 323, 329 (5th Cir. 1987).  The Supreme Court has provided a framework for this analysis:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party;  the extent of the hired party's discretion over when and how long to work;   the method of payment; the hired party's role in hiring and paying assistants;  whether

---

[11] This section is really statutory permission for certain kinds of independent contractors to give authorship to their buyers.

the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party. No one of these factors is determinative.

Cmty. for Creative Non-Violence v. Reid, 490 U.S. at 751-752 (citations omitted).


Considering these factors, it seems plain enough that Gray Loon was an independent contractor rather than POA's employee. The website was thus not a "work made for hire."


**Copyright Transfer**


The Copyright Act recognizes a broad variety of forms by which ownership of copyright interests may be transferred: "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101. Transfer of ownership requires a writing signed by the copyright owner or his agent which memorializes the rights conveyed. See 17 U.S.C. 204(a). Although the writing may lack terms such as "transfer" and "copyright," evidence that the parties intended to transfer the copyright interest may be sufficient evidence that the parties intended to transfer the interest. 3-10 M. Nimmer & D. Nimmer, Nimmer on Copyright § 10.03 (1989). One court described the level of detail required in this way: it "doesn't have to be the Magna Carta; a one-line pro forma statement will do." Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 557 (9th Cir. 1990), cert. denied, 498 U.S. 1103 (1991).


Although the federal circuits do not yet agree on the nuances, they do agree that some subsequent writings are sufficient to fulfill the requirement. See Konigsberg Int'l Inc. v. Rice, 16 F.3d 355 (9th Cir. 1994); Billy-Bob Teeth, Inc. v. Novelty, Inc., 329 F.3d 586 (7th Cir. 2003); Imperial Residential Design, Inc. v. Palms Dev. Group, Inc., 70 F.3d 96 (11th Cir. 1995) (signing may occur after complaint filed); Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.,

15

29 F.3d 1529 (11th Cir. 1994) (writing may occur after registration). A signed contract making no reference to ownership and lacking essential terms is inadequate as a memorandum of transfer. Pamfiloff v. Giant Records, Inc., 794 F. Supp. 933 (N.D. Cal. 1992).

The language in Gray Loon's proposal indicating that it is Gray Loon's "philosophy that clients have purchased goods and services from us and that inherently means ownership of those goods and services…" does not carry the weight and certainty required by the Copyright Act. Furthermore, the formalities of copyright ownership transfer were clearly not met, inasmuch as the proposal – the only document purporting to grant POA any ownership interest in Gray Loon's intellectual property – was not signed as required by § 204.

The level of formality in vendor-client relationships varies according to the size and sophistication of the parties and the size and duration of their project. While large technology firms and substantial customers commonly employ contracts that allocate ownership and responsibilities, we perceive that the absence of such agreements in this case is not a radical departure from the practices that prevail in small firms and small projects.

There having been no agreement that effectively produced a transfer to POA, however, we conclude that the website remained the property of Gray Loon.

**Nonexclusive License**

While copyright transfer requires a signed writing, one incidence of ownership that may be transferred without a writing is a "nonexclusive license," a creation fashioned by courts for situations in which parties intended to transfer a copyright, but failed to do so in writing. Such a license can be granted orally or implied from the conduct of the parties. Effects Assocs., Inc., 908 F.2d at 558; 3 Nimmer on Copyright § 10.03[A], at 10-36.

16

> "Nonexclusive licenses do not constitute transfer of ownership rights and do not come within the purview of copyright law. Rather, they simply permit the use of a copyrighted work in a particular manner. An implied nonexclusive license is granted when (i) a person (the licensee) requests the creation of a work; (ii) the creator (the licensor) makes that particular work and delivers it to the licensee; and (iii) the licensor intends that the licensee copy and distribute his work. See Effects, 908 F.2d at 558-59."

Holtzbrinck Publ'g Holdings, L.P. v. Vyne Commc'n, Inc., 2000 WL 502860 *4 (S.D.N.Y. 2000).

What POA had was a nonexclusive license. Piece of America, the licensee, requested the creation of a website. Gray Loon, the creator/licensor, made and "delivered" the work to the licensee. As a nonexclusive licensee, POA never had ownership of the site under copyright law. POA purchased a non-exclusive license, which we might read as granting it rights to use the site as its own.

This conclusion makes short work of POA's conversion claim. Because the website actually did not belong to POA, it cannot bring a claim for conversion. Furthermore, even if POA had owned the website, Gray Loon did not commit conversion. It performed the work – including hosting the site – at POA's request. When POA did not pay, Gray Loon discontinued its hosting service and refused to hand over a copy of the site. Because this contingency was not addressed by the proposal, the common law of contract applies, not conversion. POA elected to pursue its counterclaim only on the latter grounds.

Piece of America's failure to pay the seventy-five dollar per month hosting fees alone could justify Gray Loon's taking down the site from the Internet. If it had paid all other fees, there might be a dispute as to whether Gray Loon had breached its license agreement by refusing to transfer the files to POA, but POA's failure to pay the June 2004 invoice coupled with the fact it did not request the files from Gray Loon persuades us that Gray Loon is not at fault either for withholding the files or taking the site offline.

17

## Conclusion

The trial court having found for Gray Loon on its claim and on POA's counter-claim, we affirm.

Dickson, Sullivan, and Rucker, JJ., concur.

Boehm, J., concurs in result with separate opinion.

**Boehm, Justice, concurring in result.**

I agree with the majority's analysis and conclusions on the record in this case. I write separately to explain why I agree that Piece of America (POA) is not entitled to relief for what amounts to a destruction of the website it had paid Gray Loon to construct.

POA's first counterclaim alleged that the "actions of plaintiff constitute conversion in violation of I.C. 35-43-4-3 as well as common law conversion." Criminal conversion that gives rise to a treble damages award is defined by statute, which requires that "property of another" be subject to unauthorized control. Ind. Code § 35-43-4-3 (2004). The Court of Appeals has described the civil tort of conversion as, among other things, either the "appropriation of the personal property of another to the party's own use and benefit" or its "destruction." Computers Unlimited, Inc. v. Midwest Data Sys., Inc., 657 N.E.2d 165, 171 (Ind. Ct. App. 1995). An essential element of either conversion claim is an "immediate, unqualified right to possession resting on a superior claim of title." Shourek v. Stirling, 621 N.E.2d 1107, 1109 (Ind. 1993).

Two issues present themselves: is a website "property" and if so what were POA's rights in the website? At least two other states now recognize claims for conversion of electronic data, internet domain names, and website content. See Deborah F. Buckman, Annotation, Conversion of Electronic Data, Including Domain Names, 40 A.L.R.6th 295, 306–12 (2008) (noting that New York and California have held such claims cognizable). Although Indiana cases have not addressed the issue specifically, several decisions from this state suggest that electronic data is "property" for the purposes of tortious or criminal conversion. See, e.g., State v. McGraw, 480 N.E.2d 552, 554 (Ind. 1985) (opining that the information derived by use of a computer counts as property under the theft statute); Moser v. State, 433 N.E.2d 68, 70–71 (Ind. Ct. App. 1982) (affirming conversion conviction where defendant obtained cable television signal without paying for it). But see Coleman v. Vukovich, 825 N.E.2d 397, 407–08 (Ind. Ct. App. 2005) (holding that software-generated data would not be subject to conversion, trespass, or replevin claims, "which relate only to . . . chattels themselves"). I agree with the implication of the

19

majority that a website design is personal property and is subject to a conversion claim, whether or not it is "goods" subject to the Uniform Commercial Code.

I agree with the majority's conclusion that the first phase of the website was completed and paid for and the second phase constituted a separate transaction. The issue is whether Gray Loon had the right to dismantle the site when POA did not pay for the second phase. As the majority explains, when the first phase of the website was completed and paid for, POA did not acquire title to the site but did obtain a nonexclusive license to the code defining the site. A nonexclusive license is a "personal contractual privilege that does not create a property interest." Uniform Computer Information Transactions Act § 503 cmt. 3a (Supp. 2008). "A nonexclusive license has been described as nothing more than a promise not to sue. It does not convey property rights in the information to the licensee." Id. § 102 cmt. 41; see also 3 Melville B. Nimmer and David Nimmer, Nimmer on Copyright § 10.01[C][5] n.73.1 (2008) (noting that a license is, "in legal contemplation, merely an agreement not to sue the licensee for infringement"). Without a property interest in the website, POA cannot sustain a common law conversion claim and is thus entitled to no relief on its action as pleaded.

A licensee is not without a remedy, however. A nonexclusive license is an implied-in-fact contract, I.A.E., Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996); Effects Assocs., Inc. v. Cohen, 908 F.2d 555, 559 n.7 (9th Cir. 1990), and it becomes "irrevocable if supported by consideration." 3 Nimmer, supra, § 10.02[B][5]; see also Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc., 128 F.3d 872, 882 (5th Cir. 1997) ("A nonexclusive license may be irrevocable if supported by consideration."). Moreover, "[c]ourts regularly invoke the principle that a copyright licensor shall not 'do anything which would interfere with the licensee's right to enjoy the fruits of the license.'" 1 Paul Goldstein, Goldstein on Copyright, § 5.3.4.1b (3d ed. 2005) (quoting Viacom Intl., Inc. v. Tandem Prods., Inc., 368 F. Supp. 1264, 1274 (S.D.N.Y. 1974), aff'd, 526 F.2d 593 (2d Cir. 1975)). "A grantor's breach of its obligations under a copyright contract will entitle the grantee to recover damages, to obtain injunctive relief and, if the breach is material, to rescind the contract." Id. § 5.3.5. There is no dispute in this case that the agreed

price of the first version of the website was paid in full. POA therefore acquired an irrevocable license in the website which Gray Loon dishonored when it performed its destructive updates.

Gray Loon may have been justified in taking the site offline after POA failed to pay its hosting fees. But POA, by neglecting to pay the hosting fees, did not forfeit its license to the original website code and content. The majority observes that POA did not request a copy of the first phase website files. This does not relieve Gray Loon of its responsibility to preserve the initial version of the website that had been licensed to POA. After the companies fell out, POA retained its right to access those files under its nonexclusive license. Gray Loon was the sole custodian of the licensed code and elected to alter the site without preserving phase one before it reached a definitive agreement as to price or scope of work for phase two. As I see it, under these circumstances Gray Loon created the problem that the licensed code no longer existed. It therefore had no right to seize both phases as collateral for its unpaid work on the second phase.

Whether POA had any damages from Gray Loon's breach is a matter of speculation on this record. POA elected to pursue only a conversion theory, presumably in hopes of treble damages and attorney fees in this dispute over an amount that surely is dwarfed by the cost of this litigation. Similarly, when Gray Loon sued for its fees, POA did not assert breach of its license as either an affirmative defense or set-off. I therefore concur in the result reached by the majority.