NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**NEUROPTICS, INC.,**
*Plaintiff-Appellant*

**v.**

**BRIGHTLAMP, INC.,**
*Defendant-Appellee*

---

2022-1059

---

Appeal from the United States District Court for the Southern District of Indiana in No. 1:19-cv-04832-JMS-MG, Judge Jane Magnus-Stinson.

---

Decided: February 17, 2023

---

PETER R. AFRASIABI, One LLP, Newport Beach, CA, argued for plaintiff-appellant. Also represented by NATHANIEL L. DILGER.

ALLAN J. STERNSTEIN, Intellectual Property Clinic, Indiana University Mauer School of Law, Bloomington, IN, argued for defendant-appellee.

---

Before LOURIE, TARANTO, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

NeurOptics, Inc. and Brightlamp, Inc. do not agree on whether they agreed. So now they are litigating over whether they should continue litigating. Because we agree with the district court that the parties entered into a binding settlement agreement, we affirm that court's dismissal of this patent infringement case – notwithstanding our disagreement with the district court as to the scope of the parties' settlement.

I

NeurOptics, Inc. ("NeurOptics") manufactures pupillometers, which are devices that measure pupil size and an eye's response to light. Brightlamp, Inc. ("Brightlamp") produces a smartphone application, named Reflex, with pupillometer functionality. NeurOptics believes Brightlamp's Reflex infringes one or more of NeurOptics' patents.

On March 27, 2019, NeurOptics sent a cease-and-desist letter to Brightlamp's Chief Executive Officer ("CEO"), Kurtis Sluss. In its letter, NeurOptics notified Brightlamp of its view that Reflex infringes "multiple NeurOptics patents," adding that NuerOptics "holds an extensive and wide-reaching intellectual property portfolio that is focused on protecting all aspects of NeurOptics' pupillometer technology." J.A. 217. The letter listed twenty-two U.S. patents NeurOptics considers to be part of its "extensive patent portfolio protecting its pupillometer technology." J.A. 217-19.

NeurOptics expressly accused Brightlamp of infringing two of those patents: U.S. Patent Nos. 9,402,542 (the "'542 patent") and 6,820,979 (the "'979 patent"). J.A. 219-20. We will refer to the '542 and '979 patents collectively as the "Two Asserted Patents." The letter provided claim charts comparing the limitations of one claim from each of the Two Asserted Patents to Brightlamp's Reflex product. The letter emphasized that the two charted claims were "only

exemplary" and "not intended to be an exhaustive explanation of the patents or claims infringed by Brightlamp's Reflex product." J.A. 222. NeurOptics went on to state that it "in fact believes that the Reflex product unquestionably infringes . . . additional NeurOptics Patents." J.A. 222. Finally, it urged Brightlamp, "[i]n choosing your next steps," to "review not only the claims found in the '542 and '979 patents, but also the claims found in U.S. Patent No. 6,116,736; 6,260,968; 7,147,327; 7,670,002; and 8,235,526." J.A. 222. We will refer to these five patents as the "Five Additional Patents." Each of the Two Asserted Patents and the Five Additional Patents, which all descend from the same patent application, expired on or before August 1, 2021. The Two Asserted Patents, the Five Additional Patents, and the other fifteen patents listed in the NeurOptics letter (which we will refer to as the "Fifteen More Patents") together make up the twenty-two patents NeurOptics notified Brightlamp of in its letter.

On December 6, 2019, NeurOptics sued Brightlamp. The complaint alleged that Brightlamp infringed "at least" the '542 and '979 patents, defining these Two Asserted Patents as the "Asserted Patents." J.A. 2 ¶ 4; *see also* J.A. 46 (case management plan repeating allegation that Brightlamp has infringed "at least" the Two Asserted Patents). As support, the complaint included claim charts "compar[ing] Reflex's function and operation against representative claims" of the Two Asserted Patents. J.A. 4-8 ¶ 13. The complaint culminated in two (and only two) claims for relief: one alleging infringement of the '542 patent and the other alleging infringement of the '979 patent. As relief, NeurOptics sought "[a]n adjudication that Defendant has willfully infringed and continues to infringe the '542 Patent and '979 Patent," without referring to any other patent. J.A. 13.

While the complaint made explicit allegations of infringement of just the Two Asserted Patents – it contained no claim charts for any other patent nor any claim for relief

based on any other patent – it also stated that the two claim charts were "only exemplary" and "not intended to be an exhaustive explanation of the infringed patents or claims." J.A. 8 ¶14.  Much like the earlier notice letter sent to Brightlamp, paragraph 14 of the complaint stated:

> NeurOptics in fact believes that the Reflex pupillometer has likely infringed additional claims from both the [Two Asserted Patents] and may have infringed various claims from additional NeurOptics patents, including potentially [the Five Additional Patents].  As NeurOptics completes its investigation, it expects to amend this complaint to identify any additional infringed patents.

J.A. 8 ¶14.

In due course, Brightlamp filed an answer, denying infringement, and counterclaims for declaratory judgments of non-infringement, invalidity, and unenforceability of the Two Asserted Patents (as well alleging that NeurOptics violated the Sherman Act).  Brightlamp also filed a motion to strike the portions of the complaint alleging it infringed any patents other than the '542 and '979 patents (including the portion of the complaint excerpted above).  In opposing the motion, NeurOptics explained that "the challenged language," that is, paragraph 14, "is not an allegation of patent infringement" but, instead, "states only that NeurOptics intends to do that which the law explicitly allows, i.e., investigate whether it has additional infringed patents and – if it does – to amend its complaint to assert those patents." J.A. 447-48.  The district court denied the motion.

NeurOptics never did amend its complaint. Both parties agree the case has never involved any allegation of infringement of any patents other than (at most) the Two Asserted Patents and the Five Additional Patents.

In May 2020, the parties began discussing a possible settlement. Specifically, on May 15, 2020, NeurOptics' attorney, Nathaniel L. Dilger, sent a letter to Brightlamp's attorney, Norman J. Hedges, providing "[t]he following settlement demand:"

> 1. For a period of 6 years, Brightlamp will agree to neither market nor knowingly offer for sale or sell its accused pupilometer application to hospitals or licensed medical professionals.
>
> 2. Brightlamp will pay NeurOptics $7,500[].
>
> 3. In return for the above, NeurOptics will covenant not to sue Brightlamp on NeurOptic[s]'[] *pupillometer patent portfolio*, subject to the field of use restriction above.
>
> 4. The parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.

J.A. 107 (emphasis added).[1]

We have highlighted the term "NeurOptics' pupillometer patent portfolio," which is the term at the center of the

---

[1] The parties used "pupilometer" and "pupillometer" interchangeably in their communications.

parties' dispute on appeal. The parties continued to use this term throughout their negotiations but, as we explain further below, never discussed it until after they had already reached an agreement.

On July 20, 2020, the district court granted Brightlamp's motion for a discovery conference and scheduled the conference for a week later, on July 27. This seems to have spurred renewed attention to their settlement efforts as the parties' CEOs negotiated directly with one another over the following days. On July 22, 2020, NeurOptics' CEO, William Worthen, emailed a revision of NeurOptics' May settlement demand to Brightlamp CEO Sluss. The next day, July 23, Sluss sent back the following modified proposal to Worthen:

1. Brightlamp will agree to neither market to hospitals nor knowingly offer for sale or sell its accused pupilometer application to hospitals, up to the expiration of the patents-in-suit (i.e. August 1, 2021).

2. In return for the above, NeurOptics will (a) forego its claim for damages and (b) covenant not to sue Brightlamp on NeurOptics' *pupillometer patent portfolio*, subject to the field of use restriction above.

3. Brightlamp to pay NeurOptics $2,500.

4. Both parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.

J.A. 114 (emphasis added).  Sluss concluded his message with "[p]lease let me know if we're in agreement so I can forward this on to my counsel."  J.A. 114.

The next day, July 24, NeurOptics' Worthen responded by addressing only the financial term of Sluss' offer, paragraph 3, writing: "$4k and we[']re done/good to go."  J.A. 113.  Sluss counteroffered: "If you can agree to $3,000 then we can wrap this up."  J.A. 113.  Worthen responded "Ok," to which Sluss replied: "Thanks, *happy we can come to an arrangement*."  J.A. 112 (emphasis added).  Sluss then listed his understanding of the agreed-upon terms, which he indicated he would be sending to Brightlamp's legal team:

> 1. Brightlamp will agree to neither market to hospitals nor knowingly offer for sale or sell its accused pupilometer application to hospitals, up to the expiration of the patents-in-suit (i.e August 1, 2021).
>
> 2. In return for the above, NeurOptics will (a) forego its claim for damages and (b) covenant not to sue Brightlamp on NeurOptics' *pupillometer patent portfolio*, subject to the field of use restriction above.
>
> 3. Brightlamp to pay NeurOptics $3,000.
>
> 4. Both parties will dismiss with prejudice all claims and counterclaims, with each side bearing its own costs and fees.

J.A. 112 (emphasis added).  We refer to these terms as the "July 24 Agreement."  Worthen did not reply, but instead

forwarded the terms to NeurOptics' counsel, Dilger, who suggested to Brightlamp's counsel that together "we contact Chambers and let them know that *we've reached agreement* and expect to be filing a notice of dismissal once we finalize the paperwork." J.A. 289 (emphasis added).

Counsel for the parties then called the district court to ask it to cancel the discovery conference, which was only one business day away. The district court did so, stating in its order that it had been "advised by counsel that a settlement has been reached in this action." J.A. 463. The court further ordered that, within 30 days, "the plaintiff shall file a motion to dismiss this cause or a stipulation of dismissal." J.A. 463. NeurOptics never filed either type of document. Instead, the parties' efforts to execute formal settlement documents failed.

NeurOptics attorney Dilger sent a "draft settlement agreement" to Brightlamp attorney Hedges on August 5. After noting in the recitals that NeurOptics alleged in the litigation that "certain of Brightlamp's products infringe" the Two Asserted Patents, and that both parties "wish . . . to settle any dispute between them regarding alleged infringement of" those Two Asserted Patents, the draft agreement released Brightlamp and covenanted not to sue Brightlamp on "the NeurOptics Patents," which the draft defined as the Two Asserted Patents plus "any and all Patents existing or subsequently issuing from applications from which an Asserted Patent [i.e., the Two Asserted Patents] claims priority." J.A. 241. That definition covers the Two Asserted Patents and the Five Additional Patents but does not cover the Fifteen More Patents.

The next day, Hedges, for Brightlamp, responded with a redline that reduced the proposed agreement to basically just the language Brightlamp CEO Sluss had provided as his understanding of the material terms in his July 24 confirmatory email, including a "covenant not to sue Brightlamp on NeurOptics' *pupillometer patent portfolio*,"

without defining the scope of that portfolio. J.A. 249-50 (emphasis added). Later that same day, Dilger, on behalf of NeurOptics, rejected this truncated version as "unacceptable," contending it "le[ft] numerous terms open," but without identifying any specific open terms. J.A. 254.

Hedges replied on August 11 that his proposal was "exactly what was agreed by the parties." J.A. 254. He further expressed his belief that "all issues are addressed and asked NeurOptics to identify "any terms in our agreement that you believe are left open." J.A. 254. The attorneys for the two sides apparently spoke again on August 25. J.A. 308. On August 28, Brightlamp sent NeurOptics a marked-up version of the August 5 draft settlement agreement NeurOptics had proposed. As relevant to us, this mark-up changed NeurOptics' draft so that NeurOptics would be agreeing not to sue Brightlamp on claims arising from the "NeurOptics Pupilometer Patent Portfolio," which Brightlamp's draft defined as "any and all patents owned by NeurOptics as of the Effective Date that cover pupilometer products or components thereof, or the Accused Products," which would have expanded the scope of the covenant from what NeurOptics had proposed. NeurOptics had limited the covenant not to sue to the "NeurOptics Patents," which, as we have already noted, was defined in a manner that included the Two Asserted Patents and the Five Additional Patents but not the Fifteen More Patents. J.A. 281, 308. The Brightlamp proposal did not lead to any resolution between the parties.

On September 23, 2020, Brightlamp filed a motion to enforce the settlement agreement and to dismiss the action. NeurOptics opposed, insisting that because the parties had not agreed on the scope of the "NeurOptics' pupillometer patent portfolio," which was an essential term, there was no agreement. The district court denied the motion without prejudice, to allow the parties to confer with a magistrate judge in an attempt to reach an amicable disposition. When the discussions proved unfruitful,

10    NEUROPTICS, INC. v. BRIGHTLAMP, INC.

Brightlamp brought a renewed motion to enforce the settlement agreement and to dismiss the case. This time the district court granted the motion, finding the parties had entered into a valid, binding, and enforceable settlement agreement.

In doing so, the district court explained that the dispute before it was whether there had been a meeting of the minds as to which patents NeurOptics agreed it would not sue Brightlamp on and on which it would release Brightlamp from any potential liability. NeurOptics argued it had only intended to release Brightlamp with respect to "any and all Patents existing or subsequently issuing from applications from which an Asserted Patent claims priority," which is the definition NeurOptics had included in its August 5 draft agreement, and which corresponds to the Two Asserted Patents and the Five Additional Patents. J.A. 257. In contrast, Brightlamp proposed that the release and covenant not to sue included "any and all patents owned by NeurOptics . . . that cover pupilometer products or components thereof, or the Accused Products," the definition it had written into its August 28 draft. J.A. 364.

The district court concluded that "[n]one of the evidence presented supports NeurOptics' contention that the parties had differing intentions regarding the covenant not to sue during the discussions leading up to the July 24, 2020 email agreement." J.A. 363. As part of its decision, the district court determined that the unambiguous meaning of the disputed term "NeurOptics' pupillometer patent portfolio" is "the range or collection of pupillometer patents possessed by NeurOptics" but that the term did not extend to "patents for components of pupillometers, rather than pupillometers themselves." J.A. 343-44. This definition appears to have been broader than what NeurOptics argued for but somewhat narrower than what Brightlamp proposed. It plainly included the Two Asserted Patents and the Five Additional Patents but its scope beyond those seven patents is unclear.

The district court entered final judgment and NeurOptics timely appealed.[2]

## II

We apply the law of the regional circuit, here the Seventh Circuit, to issues not unique to our exclusive jurisdiction. *See Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171, 1178 (Fed. Cir. 2011). Enforcement of a settlement agreement is one such issue. *See id.* Seventh Circuit law, in turn, directs us to apply Indiana state contract law to NeurOptics' challenge to enforcement of a settlement agreement. *See Beverly v. Abbott Labs.*, 817 F.3d 328, 333 (7th Cir. 2016).

We also look to Seventh Circuit law for the appropriate standards of review. *See Sokol Crystal Prod., Inc. v. DSC Commc'ns Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994). Whether a contract exists presents a question of law we review de novo. *See Newkirk v. Vill. of Steger*, 536 F.3d 771, 774 (7th Cir. 2008). We review any underlying factual findings for clear error. *See ReMapp Int'l Corp. v. Comfort Keyboard Co.*, 560 F.3d 628, 633 (7th Cir. 2009). Indiana law recognizes that intent determinations, including assessments of the intentions of parties to a purported contract, are factual. *See Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005) ("The intention of the parties to a contract is a factual matter to be determined from all the circumstances."). If we determine a settlement agreement exists, we review the decision to enforce that agreement for abuse of discretion. *See Wilson v. Wilson*, 46 F.3d 660, 664 (7th Cir. 1995).

---

[2]    The district court had subject-matter jurisdiction under 28 U.S.C. § 1338. We have jurisdiction over the appeal under 28 U.S.C. § 1295(a).

III

NeurOptics' appeal presents two issues for us to address. First, we must determine whether the parties entered into an enforceable settlement agreement. We agree with the district court that they did, as the record evidence supports the conclusion that as of July 24 the parties had a shared intent to resolve their patent infringement dispute and reached agreement to do so. Second, we must assess whether the district court abused its discretion in enforcing the July 24 agreement and dismissing the parties' claims and counterclaims. We find that it did not. The scope of the covenant not to sue and release – which turns on the meaning of "pupillometer patent portfolio" – is sufficiently definite to allow a reasonable and logical interpretation. As we explain, it includes only the Two Asserted Patents and the Five Additional Patents.

A

Under Indiana law "[t]he basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds of the contracting parties." *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 812-13 (Ind. 2009). The parties do not dispute that the first three elements – offer, acceptance, and consideration – are present here. Thus, the question of whether there is a binding contract to settle this case turns on whether there was a meeting of the minds. This requirement is satisfied if the parties had the same intent in forming the agreement. *See Zimmerman*, 826 N.E.2d at 77. To evaluate this issue, we limit our analysis to the objective manifestations of the parties, including the contract and other extrinsic evidence, such as the parties' statements during negotiations; subjective intent is immaterial. *See id.*

NeurOptics insists there was no meeting of the minds because the parties did not have a shared understanding as to the meaning of "pupillometer patent portfolio." Therefore, NeurOptics contends, there was no meeting of

the minds on the essential term of the agreement's release and covenant not to sue. In the view of NeurOptics, the purported agreement is ambiguous as to whether the parties intended to settle disputes solely with respect to the Two Asserted Patents, the Five Additional Patents, and/or the Fifteen More Patents.

We disagree. Our review of the objective manifestations of the parties' intentions persuades us, as it did the district court, that there was a meeting of the minds. In particular, the series of written documents exchanged between the parties consistently demonstrate that both NeurOptics and Brightlamp intended that NeurOptics would release and covenant not to sue Brightlamp for infringement of the Two Asserted Patents and of the Five Additional Patents. The record shows that the parties mutually understood during their interactions leading up to and culminating in the July 24 Agreement that "pupillometer patent portfolio" meant the Two Asserted Patents plus the Five Additional Patents. In short, the record evidence repeatedly shows that the CEOs both intended to resolve the patent disputes that were potentially at issue in this litigation and that those disputes related to these seven patents, and only these seven patents.

When NeurOptics first contacted Brightlamp with its March 2019 letter, it provided notice that the Reflex product infringes "multiple NeurOptics patents" and charted how the Two Asserted Patents were allegedly infringed. J.A. at 217-22. While NeurOptics listed a total of twenty-two of its patents, including the Fifteen More Patents, it specifically urged Brightlamp to "review not only the claims found in the [Two Asserted Patents], but also the claims found in [the Five Additional Patents]." J.A. at 222. NeurOptics was communicating to Brightlamp that while it had an extensive patent portfolio, the patents it was most likely to assert against the Reflex were the Two Asserted Patents and the Five Additional patents.

When NeurOptics filed suit in December 2019, its concentration on the Two Asserted Patents and Five Additional Patents grew even stronger. The Two Asserted Patents and the Five Additional Patents are expressly referenced in all the key documents filed in this litigation, including the complaint, answer and counterclaims, and motion to strike. NeurOptics formally accused Brightlamp of infringing only the Two Asserted Patents and also explicitly identified, in the complaint, the Five Additional Patents as patents Brightlamp "may have infringed" and for which it might add infringement claims in an amended complaint. J.A. 8. Brightlamp's motion to strike was directed to this very statement, as Brightlamp tried – but failed – to limit the scope of this litigation to just the Two Asserted Patents.

As to the Fifteen More Patents, they are not referenced in the complaint or in any other litigation document to which the parties have pointed us. We see no evidence that NeurOptics ever actually alleged that Brightlamp's Reflex product infringes any claim in any of the Fifteen More Patents. We cannot find any references in the record to these additional patents after the March 2019 notice letter. During the course of negotiations leading up to the July 24 Agreement, there is simply no objective manifestation of any intent by either party to enter into a release and covenant not to sue with respect to the Fifteen More Patents or with respect to any other patents NeurOptics might hold. Any undisclosed subjective intent Brightlamp might have privately held is not relevant to our inquiry. The district court's conclusion that the parties intended to settle with respect to patents other than the Two Asserted Patents and the Five Additional Patents – including, potentially, the Fifteen More Patents – is, therefore, clearly erroneous.

In sum, this case was always about the Two Asserted Patents as well as the Five Additional Patents. No effective settlement agreement could have addressed anything less than these seven patents. As far as the record reveals,

the negotiations between the CEOs that led to the agreement to settle did not involve any discussion of the full scope of the term "pupillometer patent portfolio." The correspondence between the two parties' CEOs does not evince any disagreement or confusion about the scope of the proposed release and covenant not to sue. Dilger, NeurOptics' attorney, used the term "NeurOptics' pupillometer patent portfolio" in his initial settlement offer, without providing a definition or offering clarifying language, and this same term appeared in nearly every proposal from either side without any change. The CEOs negotiated several other terms of the agreement but not this one. When Sluss, on behalf of Brightlamp, asked Worthen whether they were "in agreement" on July 23, Worthen thereafter addressed only the payment amount, indicating that the other terms were not in dispute. All of this objectively supports the conclusion that the CEOs had a common understanding of the scope of the covenant not to sue.

Most importantly, there is no indication in the record that either side believed, or acted as if it believed, that the term failed to extend to the Two Asserted Patents and the Five Additional Patents, which together made up a single patent family.[3] The negotiations, then, provide additional objective evidence that the parties had a meeting of the minds to resolve their disputes as to the Two Asserted Patents and the Five Additional Patents. While we conclude that the district court erred in its reading of "NeurOptics' pupillometer patent portfolio," we fully agree with its larger conclusion that the parties reached a binding agreement to settle this litigation.

---

[3] Indeed, the parties do not dispute that the term covers at least the Two Asserted Patents as well as the Five Additional Patents.

B

Indiana law provides that settlement agreements are enforceable if (1) the parties demonstrated an intent to be bound and (2) all essential terms are sufficiently definite to allow "'a reasonable and logical interpretation.'" *Sands v. Helen HCI, LLC*, 945 N.E.2d 176, 180-81 (Ind. Ct. App. 2011) (quoting *Conwell*, 906 N.E.2d at 813); *see also Wolvos v. Meyer*, 668 N.E.2d 671, 675 (Ind. 1996). Here, the district court did not abuse its discretion in concluding both requirements were met.

1

The district court found that the "parties' conduct . . . exhibited an intent to be bound," J.A. at 345, a factual finding we review for clear error, *see Jetz Serv. Co., Inc. v. Ventures*, 165 N.E.3d 990, 994-95 (Ind. Ct. App. 2021). We find no such error. As the district court observed, after exchanging a series of proposals on the essential terms of a settlement, the two CEOs reached agreement on July 24. Then "Mr. Sluss directed Mr. Worthen to notify counsel of the agreement, Mr. Worthen did so, and the parties notified the Court the same day that a settlement had been reached." J.A. at 345. The parties intended to be bound by the essential terms they negotiated, including the release and covenant not to sue provided by NeurOptics to Brightlamp on the Two Asserted Patents and the Five Additional Patents.

NeurOptics contends that the parties merely reached an agreement to agree rather than an enforceable agreement. As support, NeurOptics observes that after reaching the July 24 Agreement, both CEOs requested that their lawyers formalize the agreement. According to NeurOptics, this shows the CEOs did not believe the agreement they had reached was itself binding. We disagree. Indiana cases make clear that parties' desire to formalize their agreement does not demonstrate they lacked an intent to be bound by what they had agreed to. *See Sands*, 945

N.E.2d at 181 (finding intent to be bound despite parties' stated desire to later formalize their agreement); *see also MH Equity Managing Member, LLC v. Sands*, 938 N.E.2d 750, 757 (Ind. Ct. App. 2020) (explaining that contracts may obligate parties to "execute a subsequent final written agreement," which "is understood to be a mere memorial of the agreement already reached"). "[A] well known rule provides that mere reference to a more formalized contract does not void the presently existing agreement." *Wolvos*, 668 N.E.2d at 675.

The CEOs' correspondence demonstrates that they sought a binding settlement agreement and that both believed they had obtained one by agreeing on its key terms. There is no indication in their discussions that they believed their obligations were contingent upon the subsequent execution of a final document. On July 23, Sluss asked Worthen whether they were "in agreement," to which Worthen responded the next day by raising only the issue of the amount Brightlamp would pay NeurOptics, a matter the CEOs reached agreement on later that day. Sluss stated in an email to Worthen he was "happy we can come to an arrangement," to which there was no objection from Worthen. J.A. 112. Indeed, in response, NeurOptics' counsel suggested telling the court that the parties had "reached agreement," and the parties then did so. J.A. 289. From this evidence, we conclude that the district court did not abuse its discretion in concluding the parties intended to be bound.

2

Under Indiana law, "[t]o be valid and enforceable, a contract must be reasonably definite and certain." *Conwell*, 906 N.E. at 813. Thus, if an essential term is sufficiently unclear to leave the intention of the parties uncertain, the contract cannot be specifically enforced. *See id.* "[A]bsolute certainty in all terms is not required." *Id.* "[A]n offer which appears to be indefinite may be given

precision by . . . [the] course of dealing between the parties." *Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309-10 (Ind. 2012) (internal quotation omitted). "A court will not find that a contract is so uncertain as to preclude specific enforcement where a reasonable and logical interpretation will render the contract valid." *Conwell*, 906 N.E.2d at 813.

As we have already explained, the term "NeurOptics' pupillometer patent portfolio" is amenable to a reasonable and logical interpretation: the Two Asserted Patents and the Five Additional Patents. These are the patents at issue in this infringement action, and these are the patents for which the parties needed resolution before this case could be dismissed. Because there was no genuine ambiguity in the July 24 Agreement, the district court did not abuse its discretion by enforcing the July 24 Agreement.

Accordingly, we affirm the district court's decision to enforce the settlement agreement and dismiss the parties' claims and counterclaims.

## IV

We have considered NeurOptics' remaining arguments and find them unpersuasive. Hence, while we vacate the district court's interpretation of "NeurOptics' pupillometer patent portfolio," because the term is properly understood in the July 24 Agreement as including only the Two Asserted Patents and the Five Additional Patents, we still affirm the district court's enforcement of the parties' settlement agreement and dismissal of this patent litigation.

**AFFIRMED**

COSTS

No costs.